# JOINT EXHIBIT #5

```
 1                    STATE OF MICHIGAN
        IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM
 2      - - - - - - - - - - - - - - - - - -
        PEOPLE OF THE STATE OF MICHIGAN,)
 3                                       )File No. 15-175-FH
        -vs-                             )JUDGE COLLETTE
 4                                       )
        BRIAN MICHAEL ALEXANDER,         )VOLUME I
 5                                       )
                     Defendant.          )
 6      - - - - - - - - - - - - - - - - -
                         JURY TRIAL
 7      before the Honorable William E. Collette,
         Circuit Judge, Ingham County, Michigan
 8               Monday, August 31, 2015

 9      APPEARANCES:

10      STEVEN J. KWASNIK, P# 67711
        303 West Kalamazoo Street
11      Lansing, MI,  48933
        (517) 483-6210
12
                    On behalf of the People.
13
        WILLIAM D. MCCRIRIE, P# 34144
14      2000 Grand River Annex, Suite 200
        Brighton MI 48114
15      (810) 229-6167

16              Co-Counsel on behalf of the Defendant.

17      SCOTT GRABEL, P# 53310
        124 West Allegan Street, Suite 636
18      Lansing, MI  48933-1707
        (800) 342-7896
19
                Co-Counsel on behalf of the Defendant.
20

21

22

23

24

25

                            1
```

Joint Exhibit 009

| | |
|---|---|
| 1        Mason, Michigan | 1       MR. KWASNIK: Okay. |

**Page 3**

1        Mason, Michigan
2        September 3, 2015
3        9:12 a.m.
4      R E C O R D
5       THE COURT: Thank you. Have a seat. I'll get
6 there. All right. We had a list of instructions that we went
7 over, and were there any objections to the ones that I gave
8 you?
9       MR. MCCRIRIE: No.
10      MR. KWASNIK: No, Your Honor.
11      THE COURT: All right. And we have intent. Any
12 objection to that?
13      MR. MCCRIRIE: No.
14      MR. KWASNIK: No, Your Honor.
15      THE COURT: There is one here about an extra active
16 improper conduct. Anybody want that or object?
17      MR. MCCRIRIE: I object to that.
18      THE COURT: All right.
19      MR. KWASNIK: Your Honor, I had requested that.
20      THE COURT: Yeah. Well, the Defense doesn't want
21 that. There was some extraneous words, but it was just
22 mentioned briefly, so I don't see it as a huge thing.
23      MR. KWASNIK: That's fine, Your Honor, as long as
24 for appellate purposes.
25      THE COURT: The point is you tried to cover it and

3

1 that's good.
2      MR. KWASNIK: Thank you.
3      THE COURT: What about character of or truthfulness?
4 I don't think we had that specific procedure ever followed.
5      MR. MCCRIRIE: I think, Judge, that I attacked but
6 not generally was typically their reputation in the community
7 for truthfulness or untruthfulness.
8      THE COURT: Yeah. I didn't see that.
9      MR. KWASNIK: That's fine, Your Honor. I leave it
10 to the Court's discretion.
11      THE COURT: And what about the statements the
12 Defendant supposedly made? Actually, they appeared to be
13 exculpatory, not incriminatory in any way. I don't see why it
14 would be a problem if they are in or out.
15      MR. KWASNIK: Again, Court's discretion.
16      MR. MCCRIRIE: I don't mind, Judge.
17      THE COURT: It's out.
18      MR. KWASNIK: Your Honor, I do have one issue. I've
19 got a demonstrative exhibit that I am planning on using in my
20 closing argument. It's just a timeline of events that we
21 created for purposes of closing. I think that the proper
22 procedure, though, would be to admit it as a demonstrative
23 exhibit and to keep it for appellate purposes later on.
24      THE COURT: I don't know that we do that. We don't
25 mark them as exhibits.

4

1       MR. KWASNIK: Okay.
2      THE COURT: We just use it and say this was a
3 compilation. It really isn't evidence of anything. It's
4 something you are using for closing.
5      MR. KWASNIK: Correct.
6      THE COURT: And you just keep it in your file.
7      MR. KWASNIK: Very good.
8      MR. MCCRIRIE: And Judge, I would object if Counsel,
9 in his closing argument, refers to it as an exhibit because
10 that's one of the things we have talked about all throughout
11 this process is what is evidence, and that's not. So I just
12 would ask that the Court caution that we not refer to it as an
13 exhibit.
14      THE COURT: Right. It's simply a demonstrative —
15 demonstrative object. Whatever. I don't know.
16      MR. KWASNIK: Just call it what it is. It's a
17 timeline.
18      MR. MCCRIRIE: Thank you, Judge.
19      THE COURT: Anything else?
20      MR. MCCRIRIE: No.
21      MR. KWASNIK: No, Your Honor.
22      THE COURT: Okay. Then at this point — I don't
23 need Kay I guess. I guess I don't need Kay right now. Let's
24 bring the jury in and you Gentlemen can proceed to closing.
25 And I appreciate — and I know it doesn't always sound like

5

1 it, but I appreciate your good work, Gentlemen.
2      MR. MCCRIRIE: Thank you, Judge.
3      MR. KWASNIK: Thank you, Your Honor.
4      (Jury back at 9:16 a.m.)
5      THE COURT: Okay. Everybody here? Okay. Have a
6 seat. All right. The lawyers and I went over prepared
7 exhibits, as I told you, and then today they came in and they
8 had a couple of others I had to review, so that took a little
9 time, and then I had another case I was going to try today and
10 we were hopeful of getting some sort of a resolution on it.
11 That's why I was in here with the attorneys. And the
12 gentleman can't speak English, so we've had an interpreter and
13 one thing or other. And that case has been put over for a
14 forensic evaluation and that's why we are late. So these two
15 Gentlemen will now give you their closing arguments. Thank
16 you.
17      MR. KWASNIK: Thank you.
18      Ladies and gentlemen, I want to start by thanking
19 you for being part of this process. I have been a Prosecutor
20 for a little over 10 years. Tried a lot of cases in this
21 court and others, and I got to say that this has been largely
22 a unique experience.
23      After having sat through this trial for two days, I
24 have no idea what you folks think of me personally or how I
25 handled this case, and I just want to say if anybody feels

6

Joint Exhibit 010

1    like I did something improper, please do not hold that against
2    Madison Bostwick.
3         So much of this evidence in this case has been
4    twisted and manipulated as to timelines and things of that
5    nature that I think it's important we take a moment to look at
6    really what is the one question that you folks as jurors need
7    to answer in this case? What is the one question? That one
8    question is, do you believe Madison Bostwick? Do you believe
9    her when she sat here in this chair and told you about the
10   times that this Defendant, her stepfather, sexually abused
11   her? And it really comes down to my recollection is she
12   talked about five different instances, and we've got four
13   charged. So of the four that are charged, do you believe her
14   about those instances? That's it.
15        In my opening statement I talked about the fact that
16   this case would come down to vulnerability and manipulation
17   and sexual assault. And as we look at the facts, I want to
18   talk to you about that vulnerability. And Maddie's
19   vulnerability was on display here over the last two days of
20   trial. This is a 17 year old soon to be high school senior.
21   She is spending her last week of summer vacation in a
22   courtroom. She did not want that. She didn't ask for that.
23        She has sat and listened to her character being
24   assassinated not only by a stranger, but by her mother and her
25   stepfather, two of the people that should be closest to her in

                                    7

1    the world and were closest to her. She never asked for that
2    and she never wanted that.
3         So ladies and gentlemen, do not think for a moment
4    that it is her presence here in this courtroom that is the
5    cause of her pain, because that is not the case. Her pain was
6    caused by this Defendant years ago, and her pain has been
7    continued since she disclosed to her mother over these last
8    months. What we have here is just a culmination of the
9    actions of this Defendant.
10        She told her sister. She told her boyfriend and she
11   told her mom. I want to talk about those disclosures. Think
12   back and -- we talked a little bit about timeline. It's
13   important. We talk about she told her sister. The events
14   happened here in the spring of 2013. She tells her sister in
15   December of 2014, over Christmas break. Dad lives in
16   Frankenmuth. That's an important fact. There was no -- there
17   was no plan in place to have dad move back to Lansing at that
18   particular time. First disclosure, Madison Bostwick, December
19   of 2014.
20        She did not begin by telling her sister even. She
21   began by asking her sister, did Brian ever do these things to
22   you? Why is that important? Because she is not trying to get
23   anyone in trouble. She is never trying to get anyone in
24   trouble. She is trying to protect her sister. She is
25   beginning her own inquiry as to making sure her sister is

                                    8

1    okay. Why? Because two years ago in 2013, she was 14, and
2    now two years later her sister is about that same age. You
3    see them. You've got a chance to witness them both. They
4    look very similar, and now she is just making sure that this
5    doesn't happen to her sister.
6         Maddie's motivation in this case has been repeatedly
7    attacked over and over again. Why would she make this up?
8    She is making this up because of this. Well, what do we know?
9    We know that dad lived in Frankenmuth. He had had plans to
10   come back to Lansing to be closer to his daughters, but those
11   plans were not set in place. They had fallen through, as
12   Stefani had talked about. And we also knew she had planned on
13   staying in Holt schools, and she had no interest in moving to
14   Frankenmuth and starting a new school halfway through their
15   junior year. She had a boyfriend at that time. She had roots
16   here. She wasn't planning on going anywhere.
17        And also know that there was no acrimony between
18   Ryan Bostwick and Stefani Alexander. She testified the other
19   day, yeah, we didn't use courts. We worked out parenting on
20   our own. There was no problem. We co-parented. We talked
21   about the fact that, yeah, he did want to move back closer to
22   his daughters, and good for him to be more part of their lives
23   if given the opportunity and still make a living.
24        Well, what did she say about what the plan was for
25   that? Well, he moved back. It would be 50/50. There was no

                                    9

1    plan in place to switch custody, and that this -- that's where
2    this is coming from. None of that existed at the time in
3    December of 2014, when Madison Bostwick first came forward.
4    None of it. In fact, Stefani Alexander is the one who said,
5    yeah, I wasn't crazy about the 50/50 time split. I wanted the
6    kids with me all the time. There is no motivation on the side
7    of Maddie at that particular time.
8         Even if -- wouldn't it make sense -- and remember
9    who she disclosed to. She disclosed to Mackenzie after
10   Mackenzie asked her about it. If the motivation was, I want
11   to leave my mother and stepdad and I want to have an
12   opportunity to go with my dad, why wouldn't she tell her dad?
13   She doesn't tell her dad. She tells Mackenzie. And what do
14   they come up with? They say -- Mackenzie says, I am going to
15   tell someone if this happens again. There was absolutely no
16   plan in place to let anyone else know about this. There was
17   no plan to tell anyone of authority that could actually make a
18   change. This was simply big sister looking out for little
19   sister, period.
20        Next she tells boyfriend Gauge. In January she
21   tells -- go back to school and she tells Gauge, her boyfriend.
22   By the way, testified no sexual contact with Gauge at that
23   time of disclosure. Why is that important? Because this idea
24   of attacking motive because she is hiding these things from
25   her mother, that wasn't the case.

                                    10

Joint Exhibit 011

|   |   |
|---|---|
| 1 What was the case? What do we know from Maddie and | 1 those reactions he seemingly — the Defendant seemingly acted |
| 2 from Gauge? Well, I asked Gauge what did dating mean to you | 2 normal all these other times, and it made her question herself |
| 3 back then as he was a sophomore in high school? She was a | 3 at times. |
| 4 junior in high school. And he said, well, we kind of hung out | 4 She is not telling Gauge to get the Defendant in |
| 5 together at school and I tried to kiss her. Okay. That's | 5 trouble. She is telling Gauge because she is talking to him |
| 6 what we are talking about here. That's the extent of the | 6 about being her boyfriend. He is a close friend of hers and |
| 7 dating relationship at that time. Is that anything to hide? | 7 she is sharing a dark secret with him. That's what you do |
| 8 Is there any motivation for this kind of disclosure? Of | 8 with close friends. |
| 9 course not. They are friends who began to hang out. They | 9 Maddie told her sister. She told her boyfriend. |
| 10 called it dating. | 10 She told her mom. Maddie decides she is going to tell her |
| 11 You know a lot of talk has been made about, well, | 11 mom. Again, why did she do that? It's not because she wanted |
| 12 geeze, Maddie and the Defendant seemed to have a very normal | 12 to get the Defendant in trouble, not in this context with the |
| 13 relationship throughout this process. All right. Very | 13 law. She testified it was because she thought her mom had a |
| 14 normal. No signs that anything else had happened. Well, | 14 right to know. At that point she is very confused and she |
| 15 yeah, because in the 10 years that she had known him as her | 15 reaches out and says — and she testified to this, as well. I |
| 16 father figure, her daily interactive father figure, things | 16 wanted help from my mom. That was her testimony. |
| 17 were good. We are talking about a maximum of five times, five | 17 Stefani Alexander sat here on Tuesday and she |
| 18 separate instances in the 10 plus years that these folks knew | 18 testified and she talked about the demeanor of Madison |
| 19 each other. Her interaction with him in a normal situation | 19 Bostwick when she told her this. And now we are up to |
| 20 was normal, and what a relief it must have been to be able to | 20 disclosure to Stefani Alexander, the mom. She talked about |
| 21 go back and interact with this person, who is your stepfather, | 21 her demeanor. Said she was clearly upset. This is not a |
| 22 in a normal reaction, because that's what's comfortable. | 22 stranger. This is her own child who she has known since birth |
| 23 That's where she — that's her whole experience with him | 23 and she knows when she is genuinely upset or not. Common |
| 24 outside of these five experiences. And she talked | 24 sense will tell you anyone who knows somebody who has had a |
| 25 specifically about the fact that he — he was really — he | 25 child, who has had a brother or a sister and grown up with |
| 11 | 13 |
| 1 became a different person when these things went on. | 1 that person, you look at them and they are genuinely upset. |
| 2 THE COURT: Can I see the attorneys up here? | 2 You know it, and she knew it. She testified that she knew it. |
| 3 (Side bar) | 3 No one in this case is saying that Stefani Alexander |
| 4 THE COURT: Sorry. | 4 was put in an easy position. It's not at all. And we can |
| 5 MR. KWASNIK: So that idea that somehow the fact | 5 have sympathy for the position that the Defendant put her in, |
| 6 that they have this normal relationship is somehow evidence | 6 but the bottom line is, at the time that Madison Bostwick went |
| 7 that it didn't happen? It doesn't — doesn't fly. It | 7 to her mom for help, as she testified, what did she get? She |
| 8 doesn't — it doesn't fly within common sense of what it was | 8 got, is this really — if this really happened you tell him |
| 9 like for Maddie to interact. | 9 what you told me or something to that effect. That's not a |
| 10 When we think about Maddie as a 14 year old girl — | 10 direct quote but that's what she testified. And I stood right |
| 11 this is, I have placed People's Exhibit 1 on the ELMO. We are | 11 here, and the way — the tone in which she said that surprised |
| 12 talking about a 14 year old girl's body and biological and | 12 me, and I said, that's what you told her in that tone? And |
| 13 brain development. Is it surprising that a 16 year old Maddie | 13 she repeated it. Said, yup, that's what I said. That tone |
| 14 having this experience with the Defendant in her past, that as | 14 says it all. Madison Bostwick went to her mom for help and |
| 15 her body and mind and things are changing and she becomes 16, | 15 she got back, let's go in and talk to the Defendant and you |
| 16 that maybe some of these things come back to her? That now as | 16 tell him what you told me, in a tone of disbelief. |
| 17 she is engaging with a boyfriend and they are trying to | 17 Since that confrontation, mom testified, or shortly |
| 18 navigate what this relationship might be and if there is going | 18 thereafter, she has contact with the Defendant every day. |
| 19 to be any physical aspects to it, that maybe her past | 19 Talks to him every day. There was testimony about the fact |
| 20 experiences at that particular time are coming back to her and | 20 that minutes after, or shortly thereafter, she testified in |
| 21 making it more forefront in her brain? | 21 the district court in full view of Maddie. She could be seen |
| 22 You remember, Maddie testified that she questioned | 22 interacting with mutual friends and the Defendant right |
| 23 whether this was — was this her own fault? Had she done this | 23 outside the courtroom. And at that time she had the nerve to |
| 24 somehow? Because that's part of the — of the manipulation. | 24 say, no, my relationship with Maddie wasn't awkward at that |
| 25 That's part of the — of the confusion of this child is that | 25 time at all. And that's what I pointed out, February 26th, |
| 12 | 14 |

Joint Exhibit 012

| | |
|---|---|
| 1 testimony at the preliminary examination. Relationship | 1 I avoided the subject and never talked about it with her. The |
| 2 between Madison and Stefani and mom becomes awkward. If it | 2 one time she wants to talk about it it's for a recording to |
| 3 hadn't already been awkward it certainly was awkward for all | 3 give to the Defense. |
| 4 to see at that time. | 4 Maddie Bostwick, in this case, has been subject to |
| 5 Stefani Alexander has -- has looked for and found | 5 cross examination on two different occasions, in District |
| 6 some very typical teenage lies about Madison, and she has | 6 Court and here in Circuit Court. She sat in that chair. My |
| 7 taken those lies and she has retroactively fitted -- fit it | 7 direct examination of her was about an hour and 15 minutes. |
| 8 upon that initial disclosure that happened way back in January | 8 She sat in that chair for close to three hours with an |
| 9 of 2015, as an excuse, well, yup, this is -- this is why I | 9 extraordinarily experienced defense attorney against a 17 year |
| 10 want to see it. She is supporting her own wishes for it | 10 old girl being repeatedly called a liar. That is a rabbit |
| 11 didn't happen, and that's almost understandable in the sense | 11 versus a fox in this situation. That was played out right in |
| 12 that for Stefani Alexander, if this didn't happen, that makes | 12 front of your eyes. And she was able to be intimidated at |
| 13 her life a lot better. But the truth is as any parent knows, | 13 times. |
| 14 at that particular moment when she was disclosed to by her | 14 You know, the Defense got her to admit, and even got |
| 15 daughter, who was upset, and told her what had happened two | 15 Gauge to admit about the lying with the text messages. But |
| 16 years before, she knew and she made a choice, and that choice | 16 even that, in looking at People's -- excuse me, Defense |
| 17 was to not believe Madison, and then she has worked to find | 17 Exhibit A, even that, was that really the complete picture? |
| 18 reasons to support that. | 18 Let's look at the exhibit itself. Let's see where we are. |
| 19 Imagine for a moment what that must have been like | 19 Hey, I was planning on -- let's move out a little |
| 20 for Madison to go to her mother for support and be met with | 20 bit. Hey, I was planning on coming home and telling my mom |
| 21 disbelief? Is it any wonder that she waited from 2013 until | 21 you broke up with me today, and I was going to say because you |
| 22 2015 to come forward? | 22 liked someone else, is that okay? And for testifying are we |
| 23 Talking about that confrontation she had with the | 23 going to wonder why we broke up? So I don't know. I'm just |
| 24 Defendant and where even the Defendant talked about the | 24 thinking. |
| 25 emotions that were showed and she was crying and upset, and | 25 Okay. Defense got her to admit that she was lying. |
| 15 | 17 |
| 1 he, like his wife, has known her for years and he knows that | 1 That she was trying to get him to lie about that. But that's |
| 2 this was genuine. He knows better than anyone. She testified | 2 actually not the case. What did Gauge testify to? I kind of |
| 3 that that confrontation went on for a long time. Despite | 3 liked somebody else. That's one of the reasons we broke up. |
| 4 that, no police report was made. No police report was made. | 4 It was a sliver of what the truth was. It was a partial |
| 5 At that time the Defendant went and stayed with a friend. | 5 truth. It wasn't a whole truth. And potentially she was |
| 6 So when you think back about the vulnerability of | 6 worried about these other -- the people finding out her |
| 7 Maddie Bostwick in this case, I want you to think about that. | 7 personal business as a 17 year old girl. Not surprisingly. |
| 8 I want you to think about her as a 14 year old child frozen in | 8 But this idea that she lied -- she lied when she said this. |
| 9 fear and confusion, wanting to say, I don't want this. Don't. | 9 No, she didn't. She didn't lie. They did break up. He did |
| 10 Stop. But being unable to do so until the Defendant was done | 10 still like somebody else. That's actually the truth. |
| 11 grinding her on himself, her clothed vagina on his clothed | 11 They are putting it on the same page. Is that |
| 12 penis or him sticking his hands down the back of her pants | 12 proper? No. That's not proper. That's why we're talking |
| 13 until he was done and she left -- and he left and she would be | 13 about it, because it's improper. If this wouldn't have |
| 14 left to cry by herself in her room, or you can even think | 14 happened, none of that would have even come in the case, |
| 15 about 16 or 17 year old Maddie Bostwick as she stands there in | 15 because it's all irrelevant who she -- what kind of relation |
| 16 that room with her mother confronting her now state trooper | 16 she has with or why she broke up with her boyfriend. Who |
| 17 stepfather, who she has known for ten years and who she loves | 17 cares? It's got nothing to do with this case. The only |
| 18 and who she wanted at her cross country meets, because that's | 18 reason it's part of this case is because of this text message. |
| 19 the guy she wants. That's the person that she wants there. | 19 And that's why -- and fortunately, when she made the poor |
| 20 She likes that guy. She wants him to be part of her life when | 20 decision to send that text message she brought that into this |
| 21 he's not acting like this. | 21 case because it was important to give context to what they are |
| 22 That vulnerability extends to shortly before trial | 22 talking about. Because we know when we go back to the |
| 23 when her mother secretly records that conversation with her | 23 timeline, that her second disclosure in January, they are not |
| 24 under the guise -- at the behest of Defense under the guise | 24 broken up. They had no sexual contact. It's not until March |
| 25 of, we don't talk anymore. Stefani Alexander even testified, | 25 when Madison texts Gauge, far after she has disclosed -- and |
| 16 | 18 |

**Joint Exhibit 013**

1 she has disclosed. Far after she disclosed to Madison, to
2 Gauge, to Stefani, had the confrontation with the Defendant,
3 did a forensic interview, met with the Prosecutor, testified
4 at the prelim, it's not until that time that she sends this
5 message. Is this message a good request? No. No. It's not.
6 It's a bad idea by a 17 year old girl who made a dumb
7 decision. But does that mean that she lied about what the
8 Defendant did to her in 2013? Absolutely not.
9     Look at this message a little further actually.
10 Maddie, bottom line, I will testify. I'm sorry you don't
11 believe me. That's fine. I promise your pain will leave you.
12 She says, it won't. Promise me you won't hurt anything. Then
13 she says, because I trusted you. I trusted Bry. Which I
14 asked her specifically who is that? She said that's the
15 Defendant, Brian. And I trusted Chase, and you are all
16 assholes.
17     This text message itself, she is telling Gauge —
18 she is reiterating to Gauge, these are people that hurt me.
19 These are people that broke my trust, including the Defendant.
20 And she puts it right there in black and white. And she does
21 later on come back and say, hey, I just wanted to make sure
22 you knew to tell the truth about anything. It's important,
23 and I don't want you to lie. Didn't get you in trouble
24 because that's not really bad. I never should have asked you
25 to do that. I'm sorry. So just make sure you tell the whole

19

1 truth — or tell the truth. That's somebody who is trying to
2 lie? That's somebody who is going out of her way to lie?
3     The only person she told initially who should have
4 done something about this didn't, and that was her mother. It
5 was Mackenzie who confided in her teacher, Mrs. Baker. It
6 wasn't Maddie. And that's how the CPS was contacted, and
7 that's how the police eventually got involved as testified by
8 Ms. Baker and anyone potentially by Detective Harrison.
9     Even Mackenzie did not set out to tell. And
10 remember when we went back to that first disclosure and she
11 talked about and said, look, I'm — if this happens again,
12 that was the plan. If it happens again, but this is a —
13 that's a heavy burden. That's a heavy burden, heavy weight
14 for these children to bear.
15     No one took this lightly. Mackenzie didn't take it
16 lightly. Gauge didn't take it lightly. Even the Defendant
17 didn't take it lightly when he talked about — when he did
18 these acts themselves, and she talked about the cautious
19 nature about which he casually came in and sat and
20 methodically moved through lying down next to her, engaging
21 her, rubbing her back, rolling her over. This was all done in
22 a methodical, deliberate way. It is truly a shame that the
23 three children in this case, who you heard from, had to bear
24 that burden when all the adults around them seemed to fail.
25     No one wants to believe their daughter is being

20

1 sexually abused. No one wants to believe that that happens in
2 their home, but everyone who is sexually abused is somebody's
3 daughter, and it takes place in people's homes. Nobody wants
4 to believe that a state trooper or a war hero would be capable
5 of this conduct, but he is, and he did.
6     This case is not about Maddie's vulnerability, but
7 Defendant's willingness to manipulate her vulnerability as a
8 child of 14, again, when she disclosed at 16, and manipulate
9 her mother, as well. Because remember, we talked about — I
10 asked Stefani Alexander — the last question I asked her is
11 the information that she gathered, who did she turn that over
12 to? I gave it over to Brian. That part of his manipulation
13 is playing the role — playing the role of the officer, of the
14 parent, of the good cross country supporter and a kind of semi
15 coach. So when you look at the evidence of this case, that
16 manipulation of Maddie's age, trust and isolation, the
17 Defendant's persona makes her vulnerable to that type of
18 ongoing abuse.
19     I want to talk specifically about some instructions.
20 The Court is going to read you an instruction. And that —
21 and that instruction is here. I expect that it'll be very
22 similar to this. If this is different from anything that the
23 Judge says be sure to follow the Judge's instructions. This
24 is what the People believe that the instruction will say. To
25 prove this charge, testimony of the victim need not be

21

1 corroborated. To prove this charge it is not necessary that
2 there be evidence other than the testimony of Madison Bostwick
3 if that testimony proves guilt beyond a reasonable doubt.
4     Why is that? Why is that instruction there?
5 Because we know that these crimes take place in isolation.
6 They take place in people's homes when there isn't anybody
7 else around. And if you needed more than that, then you would
8 never be able to convict anyone potentially who comes forward
9 on a touching case where there is no physical evidence on a
10 touching case or a late disclosure that happened two years
11 ago. You have to have a mechanism for people to get justice
12 and say, this is what happened to me, and that's what this is.
13     Ladies and gentlemen, Madison Bostwick bravely told
14 you in detail what happened to her, and it's the position of
15 the People of the State of Michigan that that is enough. That
16 that's enough — that testimony was enough to prove this case
17 beyond a reasonable doubt.
18     When — when you look at these kinds of cases, how
19 do you look to corroborating facts? You look at what she
20 said. We know that Maddie at the time had that basement room.
21 That's not in dispute. Everyone says that. We know that it's
22 not uncommon for the Defendant to be in the basement playing
23 video games. We know that's where the X-Box was. We know
24 that's where the TV was mounted on the wall, and we know that
25 he played video games.

22

**Joint Exhibit 014**

**Page 23**

1    Now, interestingly enough, he is able to say, I
2  never played video games during that time period.  I asked
3  you, is that a believable statement?  Common sense will tell
4  you if I were to ask anyone, what were you doing two years
5  ago?  Did you play video games at that particular time?  Who
6  in the world would be able to say whether they did or did not
7  unless they had another motive for coming up with that answer?
8  Especially when you look at the fact that he began as a 911
9  dispatcher in April, and before that he was a stay-at-home
10  dad.
11    I am not in any way disparaging stay-at-home
12  parenting.  It's very hard and I'm sure it's very involved on
13  a daily basis, but the idea that that particular time -- the
14  one thing about stay-at-home parenting is you stay at home.
15  You are there by your X-Box.  There is ample opportunity over
16  the course of the day to sit down and do that.  And the idea
17  that he would get up here on this stand and say, oh, no.  That
18  was a time I was off with the kids.  I never played X-Box
19  during that time.  And they made a very big deal about the
20  fact that this -- that this has been charged or that this has
21  been between April 24th after she got her television and the
22  end of the school dance, and that's our time frame.  But if
23  you actually look at what's been charged, as the Judge will
24  read an instruction about the venue and time, as it pertains
25  to criminal sexual conduct cases, we can charge a range and in

**Page 25**

1  remember specifically the Defense attorney standing with his
2  arms wide open saying, did you ever -- I am not even
3  restricting it to this time period.  Did you ever engage in
4  anything like this?  And he said, oh, no.  Is that what he
5  told Detective Harrison or did his statement change?  And I
6  asked him specifically about that, and I said, well, you said
7  something different here, didn't you?  And he said, yeah.
8  Yes.  I did.  I don't dispute that that's what I said.  I
9  said, well, was that a mistake on your part?  He said, yeah.
10  That was a mistake.
11    Because he is allowed to make mistakes, of course,
12  in his testimony.  He is allowed to say, oh, no.  I got that
13  one wrong.  I thought about it later on and I got it wrong.
14  But what has been made a huge deal in this case by the
15  Defendant?  That she testified at the preliminary examination
16  that she came home sick from school.  We know she testified
17  that it was in the evening time -- that the last sexual
18  assault occurred in the evening time.  She wasn't home from
19  school at that time.  She had been at school and she came
20  home, but it's -- she talked about, again, two years ago, do
21  you really remember?  She remembers not feeling well.  She
22  says that she -- that routinely as part of the routine she
23  would contact the -- at school she would contact her mother if
24  she didn't feel well and mom would say what?  The most
25  commonsensical thing I heard in this whole trial.  If you got

**Page 24**

1  this case we charged the entire year, 2013.
2    The only -- the only testimony in this case that
3  this incident all occurred between April and the end of the
4  school year came from Stefani Alexander.  That's not when
5  Madison Bostwick said.  She just said it -- as I know it was
6  at the end of my freshman year.  And that actually makes
7  sense, because again, going back two years ago, how do you
8  know necessarily what happened on what particular day?  You
9  just know it kind of happened around that time.  That's the
10  reason that that court rule or that that jury instruction
11  about crime, about venue and time is there on criminal sexual
12  conduct cases.
13    We know that Maddie didn't have a TV in her room
14  before her birthday certainly, and even after she did have a
15  TV in her room she didn't have Netflix on it, and so as the
16  Defendant testified on Tuesday, she would be in there watching
17  Netflix on her phone.  He admitted to Detective Harrison
18  when -- and I asked him about it and read the transcript of
19  when he was talking to Detective Harrison, and he said, yeah,
20  I guess I said that.  Yeah.  I would go -- I don't necessarily
21  remember.  I certainly could have gone in there and watched
22  television with her.  I could have engaged in these wrestling
23  and being on top of her with a choke hold and being behind her
24  with a choke hold.  Yeah.  I could have.  That's what he said
25  to Detective Harrison.  Of course, when he testified here, I

**Page 26**

1  kids you know it, and if you are at work and you get a call
2  from your kid and they say, I am not feeling well at school,
3  and I say, do you think you can make it the rest of the day?
4  That rang so true, because that is the experience that a
5  working parent can understand because it happens all the time.
6  And so she remembers being sick, and she remembers coming
7  home, and she remembers being up in her mom's bedroom where
8  it's comfy and it has a television.  But whether she has a TV
9  in her room or not, that place is a place of comfort because
10  it's mom's room.  It's where mom is -- that's where mom
11  sleeps.  There is comfort there.
12    We know the Defendant would go into Maddie's room
13  and talk.  She told us that.  We know that Maddie was not
14  feeling well.  She'd lay in her mom and Brian's bed.  TV and
15  that comfort.  Now, Stefani said, yeah, she would do that
16  occasionally, but Mackenzie would do it all the time.
17  Mackenzie is the one who gets sick at school, and she is the
18  one that texts me and never Madison.  That was her testimony.
19  Is that reasonable, that Maddie never gets sick at school and
20  she never has that same interaction with her as she does her
21  other daughter?  That's not reasonable.
22    We know that Defendant would practice self-defense
23  moves on Maddie.  And as he told Detective Harrison, that
24  would include -- you know, it could be that he would lie --
25  he'd do it from the front, the back, lying down, all sorts of

**Joint Exhibit 015**

1 different directions. All of this evidence works together to
2 corroborate the picture that supports Maddie's testimony. All
3 right.
4          Judge Collette will instruct you on the charges that
5 you are to look at in this case, and again, just as I did with
6 this one, I am going to show you criminal sexual conduct in
7 the second degree. I'll take these off so they don't bleed
8 through there. Criminal sexual conduct in the second degree.
9 In this particular case we have four Counts that are all the
10 same. I am going to talk about each Count as it relates to
11 each event as it relates to a Count, but the elements are the
12 same for each with a slight variation.
13          The Defendant is charged with a crime of second
14 degree criminal sexual conduct, and to prove this charge the
15 Prosecutor, which is me, must prove each of the following
16 elements beyond a reasonable doubt.
17          First, that the Defendant intentionally touched
18 Madison Bostwick's genital area, groin, inner thigh, buttocks
19 or breast or the clothing covering that area.
20          In this particular case as to Count 1, we are
21 talking about the very first time that Maddie was in her room
22 the Defendant came into her room and he rolled her on top and
23 had had the genital to genital contact. So we are saying that
24 Madison Bostwick's genital area was touched over the clothing
25 covering that area. And that is the same for Count 2, which

27

1 has to do with — let me double-check that. Count 2 or Count
2 3?
3          Count 2 has to again do with in that bedroom in the
4 same way that the first one occurred in Maddie's bedroom.
5 Again, him rolling her on top, Madison Bostwick's genital area
6 or the clothing covering that genital area, the touching
7 there.
8          Count 3 has to do with Defendant intentionally
9 touched Madison Bostwick's buttock or the clothing covering
10 that genital area, and this one has to do with the time that
11 she talked about being in the living room and the hand being
12 slid down —
13          THE COURT: That's not correct.
14          MR. KWASNIK: It is not correct?
15          THE COURT: No. I have that as No. 4, sir.
16          MR. KWASNIK: You have that as No. 4?
17          THE COURT: Yes.
18          MR. KWASNIK: Thank you, Your Honor.
19          THE COURT: You don't have to thank me, Mr. Kwasnik.
20          MR. KWASNIK: All right. So the third instance —
21 and again, if I misspeak at all during this particular portion
22 of the case, the Judge will read the instructions and the
23 elements, and you are to follow what the Judge tells you, and
24 that is — that's what you'd follow in this case. The same
25 thing if Defense misstates something there. So the third

28

1 instance, as the Judge has pointed out, again, this would be,
2 then, the last instance, where this happened up in mom's bed
3 in the home in the Defendant's bed, and that, again, would be
4 Madison Bostwick's genital area over the clothing covering
5 that area.
6          Then the fourth crime is the incident that happened
7 in that living room, where the Defendant, she was watching
8 Dance Moms. And she stood up, and the Defendant was hugging
9 her and she talked about him sliding his pants down the back
10 of her pants, inside her pants, inside her underwear and
11 having his bare skin touch her bare skin. So those are the
12 four crimes.
13          That's not the end of the elements, of course.
14 Second, that this was done for sexual purposes or could
15 reasonably be construed as having been done for sexual
16 purposes. I think that's pretty self-explanatory in this
17 particular case. There has been talk about wrestling and
18 things like that, but Maddie was very clear as to there were
19 times that they would screw around and wrestle, but then this
20 time he would be very much a different person. That's not
21 what was going on. She was frozen in fear. This was genital
22 to genital grinding in the first three Counts, and there is
23 really no mistaking the hand going down the back of the pants.
24          And finally, third — excuse me, third, that Madison
25 Bostwick was 13, 14 or 15 years old at the time of the alleged

29

1 act. There is no dispute about that. She was 14.
2          And that fourth, at the time of the alleged act the
3 Defendant and Madison Bostwick were living in the same
4 household, and again, there is no dispute about that.
5          Please note that the standard when we talked about
6 these is beyond a reasonable doubt. It's not beyond any doubt
7 or a shadow of doubt. It's a doubt that is reasonable. And
8 we may get an opportunity to talk a little bit more about that
9 later on. But for now, I am just going to end by talking
10 about the fact that it's Maddie's age, the Defendant's access
11 he has to her, the power differential that he has in that
12 household over her as a father-like figure, the mother's blind
13 eye. These are the things that made her vulnerable to both
14 the sexual assault and what has happened since.
15          And the People ask that as you review this case you
16 think about that vulnerability, and you think about that
17 manipulation as it supports the sexual assaults, and at the
18 conclusion of the deliberations I ask that you return verdicts
19 on all four counts of guilty. Thank you very much.
20          THE COURT: Okay. We are going to take a 10-minute
21 stretch and then do the other. All right. Don't talk about
22 the case. Go on and use the rest room and then I'll bring you
23 back in for closing.
24          (Off the record at 10:06 a.m.)
25          (On the record at 10:16 a.m.)

30

Joint Exhibit 016

1    THE COURT: Okay. Bring them in.
2    MR. KWASNIK: Your Honor, I have the paperwork
3 whenever you want to look at it.
4    THE COURT: Did it say 5?
5    MR. KWASNIK: Twice.
6    THE COURT: Why didn't you charge 5?
7    MR. KWASNIK: I didn't charge the case, Your Honor.
8    THE COURT: Why didn't whoever did it charge 5?
9    MR. KWASNIK: Our discretion.
10    THE COURT: Discretion. Of course. Why not? Could
11 have charged one.
12    (Jury back at 10:17 a.m.)
13    THE COURT: Welcome back. All right. I gave you a
14 little break because now Defense Counsel is going to talk, so
15 everybody please take your seats. Thank you. Go ahead,
16 please.
17    MR. MCCRIRIE: Thank you, Judge.
18    Good morning, folks. On behalf of Brian I want to
19 thank all of you. I recognize, and Brian recognizes the
20 commitment that you've made here because all of you coming
21 here, you don't know if you are going to get called – get
22 called or you are going to stay and then what do you do with
23 the rest of your life, your jobs and everything else that's
24 going on as you sit here. Brian and I have been watching
25 throughout this trial, and all of you have been paying

31

1 particular attention, taking notes when it's appropriate, and
2 I want to tell you on his behalf how thankful he is for your
3 attention in this case.
4    Now, some of you I know have sat through jury trials
5 before or been on juries, and just want to point out a few
6 things about the layout of the courtroom, all right, and kind
7 of the way we do things. It's not by accident. Okay. The
8 Prosecutor sits closest to you because they have the burden of
9 proof. And we as lawyers as we walk into courtrooms across
10 the State of Michigan they are all laid out differently and
11 people try to decide, well, what side do I sit on? And we all
12 know that when we walk in, the person who has the burden of
13 proof always sits the closest to the jury box. When you walk
14 into this courtroom you got them on both sides so it can be
15 confusing sometimes. But anyhow, the Prosecutor sits over
16 here closest to you folks because they have the burden of
17 proof.
18    The other thing that you are going to hear or see or
19 experience, if you will, is the assistant Prosecutor got up
20 and he gave you his closing argument. I am going to get up.
21 I am already up, but I am going to give you my closing
22 argument, and when I'm all done, I go back and I sit down and
23 the Assistant Prosecutor gets to talk to you one more time,
24 and I don't get to respond to that. I've got to sit on my
25 hands.

32

1    So here is what I generally ask jurors to do, and I
2 put it part way into my closing argument. I am going to ask
3 you to do the same thing again. When you go back into the
4 jury room or as you are sitting here listening to the
5 Assistant Prosecutor, here is what I want you to think when he
6 makes a point or he says something that I can't respond to. I
7 want you to think to yourselves, what would Bill have to say
8 about that? How would Bill respond to that? That's what I'd
9 like you to think about when he makes his final statement, and
10 recognize he gets to do that again because he has the burden
11 of proof.
12    Now, I talked to you in your opening statement
13 briefly about what's evidence and what isn't evidence. And
14 Judge Collette gave you some of those things in the
15 preliminary instructions, and he talked to you about how
16 opening statements are not evidence. Closing statements are
17 not evidence. The questions that the lawyers ask are not
18 evidence.
19    Now, why is that important? And we talked about
20 that. It's what we as lawyers call argument. Okay? It's not
21 evidence because within certain limits of the law we can stand
22 up here and say virtually anything that we want to say as long
23 as – as long as it is related to what the evidence from this
24 witness stand and the exhibits that you are going to take back
25 into the jury room, as long as it's related to that, okay?

33

1    So what I want you to think about – and you
2 probably all saw me take notes. Some of you I saw were
3 watching, writing down notes. I tried to write down some, but
4 what I want you to think about with respect to the
5 Prosecutor's closing remarks are what was supported by the
6 evidence in this case? Is it just him saying that? Is it
7 just the Assistant Prosecutor saying that or is that really
8 evidence in this case? Because what he says, what he thinks,
9 what he does, doesn't matter. What the evidence is what
10 matters, and he has – and he acknowledged this in his closing
11 argument to you that he has the burden of proof, 100 percent
12 the burden of proof.
13    Judge Collette has already read you an instruction.
14 He is going to read it to you again, and I talked about it in
15 my opening statement. I said it would be ridiculous for Brian
16 to do it, and he didn't do it in this case, but he could bring
17 in the Lansing State Journal, lean back in that chair he's got
18 with the wheels on it, open up the paper and do nothing. The
19 Prosecutor has to prove the case beyond, not a reasonable
20 doubt, beyond a reasonable doubt.
21    And we talked a little bit about the different
22 burden of proofs, the preponderance of the evidence or the
23 more likely than not in civil cases. Clear and convincing
24 evidence. Clear and convincing evidence is that burden of
25 proof that the government has if they want to take someone's

34

Joint Exhibit 017

1 parental rights away from them. So if the government thinks
2 you've done something wrong, they want to take your kids away
3 from them, the burden of proof is clear and convincing
4 evidence, but when the government is before you and they are
5 asking you to take away someone's liberty, to convict them of
6 a crime, the burden of proof is the highest one that we have
7 in the system, and that is beyond a reasonable doubt. And
8 they carry it from the beginning to the end, and when you go
9 back and do your deliberations and that's important, okay?
10 So it's not just good enough that you say, boy, I
11 don't know. I don't know who to believe. I don't know what
12 to believe. That's not beyond a reasonable doubt. They have
13 the burden of proving it to you.
14 Now, I normally -- you've kind of watched me through
15 the trial. You haven't seen me through a long trial, but I
16 tend to get a little bit animated. And the Assistant
17 Prosecutor is right. I was waving my arms around and doing
18 stuff like that, and I stand in front of you now and I am
19 going to be a little bit different in my closing argument. I
20 am going to get behind the lectern and talk.
21 I think I rewrote my closing argument four times
22 that day that Judge Collette gave us off. And I went through
23 the testimony, and I kind of tried to write down things that I
24 thought were important. Now, with that in mind, if you folks
25 heard something different, if you saw something different, you
35

1 is probably the only place in this trial, the only place in
2 this trial that I will agree with this Assistant Prosecutor,
3 and that is that in all of my years of trying cases I have
4 never been through anything like this before. I agree with
5 him on that, because I have never had anybody get up in a
6 closing argument and argue to a jury that an exhibit meant
7 something different than what his witnesses, both of them,
8 Gauge and Madison, told you they meant. Because I asked them
9 that question. He didn't. I did. And I said, when you folks
10 wrote out this text message back and forth to each other,
11 Madison, what did you mean? And she says, I meant that I was
12 planning to lie when I got in front of the jury. And I asked
13 Gauge the same thing. I said, what did you mean? He says,
14 well, she was trying to get me to lie when I came in front of
15 the jury. But this Assistant Prosecutor stood in front of
16 you, said, no. That's not really what it meant. That's why I
17 do agree with him. In my years of trying cases I have never
18 experienced anything like that before.
19 What -- if you think about it, and I argue -- I tell
20 my kids this all the time. I said, you know, think about what
21 you just said and let's take what you just said to its logical
22 extension, okay? Let's just take it out. Maybe -- as I tell
23 people, let's look over the horizon a little bit with this.
24 The logical extension of what the Assistant Prosecutor said to
25 you in his closing remark was, okay, don't believe what
37

1 collectively are probably going to be better, because when I'm
2 up asking questions I don't take notes. You saw that. I
3 don't take notes at all. I work from my memory. So I go home
4 at night after the trial and take a lot of notes as to what I
5 remember happening. Okay. So I am going to try and point out
6 to you on behalf of Brian Alexander what I think is important
7 in this case, and what I think you folks ought to do with it.
8 So I am going to take it to that second stage what I think you
9 ought to do with it, okay?
10 But there was one thing -- there was one thing that
11 the Assistant Prosecutor talked about in his closing argument
12 that I'm going to start out with, because I thought it was
13 really, really interesting the way he put it. Okay? He -- he
14 talked about the little bar around it here. He says -- put up
15 the exhibit. It was our Exhibit A, and it was the text
16 message between she and Gauge. A couple teenage kids shooting
17 text messages back. And I got a 21 year old and 22 year old
18 so they can tell me what all those acronyms mean. IKW, or
19 whatever the heck those things are. I don't know quite what
20 the heck they are.
21 So I asked -- as I told you in my opening statement,
22 I am a low tech guy in a high tech world, so I asked Madison
23 and I asked Gauge, both of them, I said, you know, when you
24 did that text message, what did you mean? Okay. And both of
25 you -- both of them told you folks what they meant. And this
36

1 Madison told you on the witness stand. Defense Exhibit A
2 means something different than what she and Gauge told you.
3 Folks, that should scare you. That should really scare you,
4 because what he is suggesting to you is, again, the logical
5 extension, what he is -- he is suggesting to you is, is that
6 when Madison was on the stand and she said to you, what I
7 meant by that was I was going to go in front of the jury and
8 lie, and I was asking Gauge to do the same thing, and he says
9 to you, the Assistant Prosecutor, I don't believe her. I
10 don't believe her. So if he doesn't believe her why should
11 you? If he doesn't believe her, why should you? Why should
12 he stand in front of you and argue to you something different
13 than what you heard in your own ears? And I am going to get
14 to a couple other instances of that in this case. Okay. But
15 that's where he and I agree. I have never been through
16 anything like this.
17 Now, I told you I am going to stand here behind the
18 lectern a little bit, and hopefully I won't bore you a little
19 bit, but I am going to try and go over points on behalf of
20 Brian that I think are really important.
21 I told you in my opening remarks I am going to ask
22 you to find him not guilty on all of these Counts. Okay. So
23 as I go through this, what I am trying to point out to you is
24 when you go back into that jury room, your sworn oath is to
25 find Brian Alexander not guilty of every single one of these
38

Joint Exhibit 018

1 four Counts. And why? Why? Because they haven't done their
2 job. They haven't met their burden of proof. That's why.
3 And they've got it and this good Judge is going to tell you
4 that.
5     Now, the Assistant Prosecutor started out in his
6 voir dire talking to you folks about things about, and asking
7 some of you individual questions about big lies, little lies.
8 Okay. I don't know where we all come from, but in my world a
9 lie is a lie is a lie. There aren't big lies and little lies.
10 We don't convict people on what we think are just little lies.
11 That's not what our system is about, but he was trying to --
12 to use a term we've seen in the media a lot lately, inoculate
13 the heard. He was going to try and get you folks all
14 comfortable with the fact that his witness was going to take
15 the stand and you were going to find out that she lies. But
16 he was going to try to make you immune to that starting in his
17 voir dire.
18     I'd like you to think about this. The Assistant
19 Prosecutor put up a timeline, okay? I didn't even bother to
20 come out and look at the timeline he had up there because
21 quite candidly, there have been so many different timelines in
22 this case coming from the witnesses that they have called,
23 it's ridiculous, just ridiculous, okay? But think about it,
24 because Judge Collette is going to tell you that you can use
25 your common sense and you can use your everyday experiences

39

1 when you decide this case, okay?
2     If you are telling the truth, the truth never
3 changes, folks. The truth is the truth is the truth. This is
4 a blue pen. I always tell my witnesses when I'm preparing
5 them to testify in Court -- I have the same story, I tell
6 them all the time, okay? I always tell them, I say, you know
7 anything about history? And they all nod their heads they
8 know history. I said, did they take history in high school?
9 And they all yes. Yes. I took history in -- do you know who
10 won the civil war? Was it the north or south? And I get this
11 bizarre look and they are thinking panicky and I say, who won
12 the civil war? And they all say the north won the civil war,
13 And I said you are right. And then I say to them this. I
14 say, is there any question that I can ask you or is there any
15 question that this Assistant Prosecutor can ask you or any
16 question that this Judge can ask you -- is there any question
17 that anybody can ask you to change the results of that? And
18 the answer to that is no. Why is that no? It's no, folks,
19 because it's history. It's over. It's happened already. And
20 everything that you heard about here in this trial, with the
21 exception of one thing, and I'll get to that, with the
22 exception of one thing is all history.
23     How can history change? It can't. The only way
24 history can change -- the only way the stories can change is
25 because people are not being honest and truthful about what

40

1 happened, and they can't keep their stories straight. That's
2 why. Because the truth is the truth is the truth. The north
3 won the civil war and this pen is blue. It can't change.
4     Now, let's look at this case. We started out with
5 the Detective on the stand. And let's remember what she
6 called my client, Brian Alexander. She sat up there on that
7 witness stand, and she looked over at Brian Alexander and she
8 called him the offender. The offender. She had made up her
9 mind.
10     Now, let's think about that. Let's explore that for
11 a little bit. She had made up her mind why? How do we know
12 that? She called him in to interview with him, and before she
13 got him in to interview with her what did she do? She went
14 and got a warrant for his arrest. She really didn't care,
15 except for to get more evidence on him, what his side of the
16 story was. She didn't care. She had a warrant for his
17 arrest. She had made up her mind. It was a rush to judgment.
18 He is the offender. And she had people waiting there when she
19 was done with her interview with him to put him in handcuffs
20 and arrest him and take him away because she had made up her
21 mind. And guess what? That's when their investigation ended.
22 It was over at that point with the exception of one thing --
23 with the exception of one thing. Two weeks before this trial
24 starts they go out to the house and take some pictures.
25 That's how much investigation went into this case after they

41

1 got a warrant for his arrest.
2     Why did the Assistant Prosecutor put that jury
3 instruction up there about one witness? Why did he do that?
4 And I did kind of try to -- I hope I did a good job of weaving
5 through in my cross exam and my direct exam. I hope I did a
6 good job of weaving through. Everything comes back to one
7 source, okay? It all comes back to that one source. Their
8 whole case rests on that one source, that one source that
9 can't keep the story straight.
10     There is no physical evidence in this case. There
11 is no DNA in this case. There is no phone records. There is
12 no text messages. There is no Kik. There is no Snap Chat.
13 There is none of that. Could they have gotten it? I think,
14 if I'm working from memory, my memory was, well, that would
15 have been tough. Well, you know what, life ain't easy, folks.
16 I mean, is that an excuse to come in here and try and convict
17 my client, to prosecute him and try and convict him because
18 that would be tough? No. It's not. It's not what we -- it's
19 not the way we do things. They have a job to do. They didn't
20 do their job, and they are coming in here and trying to sell
21 you a bill of goods. That's what's happening.
22     Let me tell you how hard it was for this Detective.
23 Let me tell you how hard it was for her to get off of the fact
24 that she had made up her mind that my client was the offender.
25 Okay. She sat in that witness stand. She sat in that witness

42

**Joint Exhibit 019**

1  stand and I asked her -- she was at the preliminary
2  examination, and I asked her about this -- this situation
3  where home from school. I asked her. Okay. And I want you
4  folks to think about in your mind how long that Detective sat
5  in that witness stand -- how long she sat in that witness
6  stand to answer my question regarding this. My understanding,
7  the fourth time you were home -- home from school sick, right?
8  Is that right? And the answer, yes. It took her forever, and
9  I don't know how many times I had to ask her before she
10  finally spit it out and finally acknowledged that, yes,
11  Madison changed her story. She testified under oath in the
12  preliminary exam unequivocated. Remember -- remember what the
13  Detective told you. What she told you was she came up with
14  something -- I think I wrote it down -- something about, well,
15  she might have been confused or she might have been mistaken
16  or she might -- I mean, that Detective couldn't spit it out.
17  She couldn't say the words. And I think I even said that to
18  her when I was questioning her. You can't say she lied, can
19  you? She did, folks. You all know that. That's your common
20  sense. Okay. She took the stand. It was a simple thing when
21  she got asked in the preliminary examination. She got asked
22  that. She said, yes. She was home from school sick.
23        Okay. Now, let's look at what happened after that.
24  Finally, the Detective was willing to admit that their witness
25  lied, Madison, the single source, if you will, okay? What did

43

1  they do with that information? Absolutely nothing. Nothing.
2  What did Stefani do? She went to school and got the records.
3  Is that hard? And she got the records and the school
4  records, our exhibit, not theirs, say she didn't miss school.
5  That wasn't too hard to go get those things, and we give them
6  to them, to the Prosecutor, to the police. What do they do
7  with them? Absolutely nothing.
8        Okay. So now mom is faced with the fact that
9  discrepancies are starting to pop up, okay? Problems are
10  starting to arise. The story is starting to fall apart. Now,
11  remember, the Assistant Prosecutor asked Stefani, where were
12  you during the preliminary examination? And this is another
13  place in his closing argument where I think he wasn't
14  exactly -- probably mistaken. I'll say it that way. Stefani
15  said she was in the victim's room with her daughter. She was
16  there with her daughter supporting her daughter with the
17  victim witness coordinator from the Prosecutor's office and
18  everything when her daughter was testifying in this case.
19  That's not a mother who is not supporting her daughter. But
20  then what happened was is she started to find out that the
21  dots weren't connecting. They just weren't coming together.
22        Okay. And then I'd like you all to think back,
23  okay? I want you all to think back at that moment when
24  Madison said in response to my question what Madison said was
25  she says, you are right. I didn't miss school. I text

44

1  messaged back and forth with my mom, and they had some
2  communication about her staying at school and coming home
3  later on. The look on this Detective's face was priceless.
4        And I asked her when she was on the witness stand,
5  you will recall, I said to her, you heard it for the first
6  time in this courtroom out of Madison's mouth, didn't you?
7  And the Detective's response was, yes. She did.
8        So what we know is -- what we know because we all
9  have common sense, we know that Madison went to Court, took an
10  oath, told the story. The police did nothing. Mom went out,
11  and good school records and showed that that wasn't accurate.
12  Did anyone bring Madison back in and talk to her about that
13  after the school records? Did the police bring her back in
14  and say, what's going on? You testified that -- that you
15  missed school and now we got the school records and that's not
16  true? No. Nothing. Not a cotton picking thing happened.
17        Now, then what happens is, is that maybe -- maybe
18  Madison is in a situation where she's going, wow. Now the
19  Defense has got this thing to show that I told one story at
20  the exam and now this, so I'm going to wait, and when I
21  testify -- because we know she had been thinking about
22  testifying through the text messages with Gauge -- this is
23  what I'm going to say when I am in front of the jury. This is
24  what my story is, because if I wait until I am sitting in the
25  courtroom and I say that, then nobody can go out and confirm

45

1  or deny what's happened, because she now knows what happens
2  when she tells people things. They go out and check up on
3  her. Okay. That's what happened. And this Detective heard
4  it for the first time.
5        But now when things like this start to happen, okay,
6  a mom brings to the -- the attention of the authorities, the
7  police, that we now have inappropriate pictures going back and
8  forth. We know that because we heard about that. We heard
9  about Madison in a room doing inappropriate things that meant
10  she couldn't lock the door anymore. We heard about all of
11  that stuff. And so what did the police do about that?
12  Absolutely nothing. I mean, these are all things -- things
13  like this that mom is bringing to the police. And she told
14  you the things that -- that her daughter was doing that were
15  escalating, and bad behavior, escalating criminal behavior,
16  escalating in lying. She brought those things to the police,
17  and you heard what she said. They didn't do anything. And
18  here is what she said to you. She said, here is what
19  happened, Bill. When I called this Detective, number one, she
20  lied to me. And the second thing that she did was is when I
21  told her -- and if you'll recall I asked Stefani specifically,
22  I said, did you give the Detective the specific incidents that
23  you thought that your daughter was lying? She said, yeah. I
24  did. Okay. And I said, what was the Detective's response to
25  that? And the answer back -- the response to that was, kids

46

Joint Exhibit 020

lie. Kids lie.

So now we've got a situation where mom has found out that Madison is lying, goes to the police with those things, says Madison is lying, and the police basically say, we know. That's what kids do. We are not going to investigate it. And remember, when I pressed this Detective on cross examination about that over and over and over again, you remember what her response was to me? Well, I wrote it down. That's not good police work, and that's not what you do. You follow up on it, okay, and find out. Because, of course, you don't want to come into the courtroom and prosecute a person with the single source — remember, the Prosecutor put that up there and said you can rely on a single source — you wouldn't want to come into this courtroom and — and prosecute a person on a single source that you know lies. Would we? Of course not. Of course not.

Now, the Assistant Prosecutor talked a little bit about stuff about Brian and the X-Box, and I think all stay-at-home parents should be offended by what he said about kind of it's not really a job, but I'll let that go. But he said, isn't it convenient that now Brian says during that period of time, I wasn't playing X-Box. Well, kind of a glib remark. Not appropriate in a setting like this, but here is what I want to take from it. That X-Box is still sitting there. And if you remember, Stefani Alexander told you she

47

went on it. Maybe she ought to be a detective, okay, but she went on that X-Box and she said, I checked the log, because it logs you in, okay? And she said, I saw the log-ins for the kids on the kids games, but there weren't log-ins for Brian. Now, why did Stefani have to do that? Why didn't the police do that?

So the Assistant Prosecutor wants to tell you that Brian conveniently forgot that or conveniently didn't play the game. Well, the stuff was there. The evidence was there. They just didn't bother to take the time to go get it, okay? But Mrs. Alexander did take the time to go get it, and you can recall her testimony, and her testimony was, I went on there. I checked it for the times that my daughter told me this happened, the window between her birthday and Farewell dance. I went on there and checked it and Brian wasn't on the X-Box. Just another situation where the credibility is seriously in question.

Now, I want to touch briefly on the third page of that exhibit where Gauge and Madison were conspiring to lie to you guys, okay? The third page is — it talks about Madison texting him and saying, just make sure you tell the truth. Remember, when you look at that back in the jury room, that was after Stefani had caught her in the situation and part of her investigation of this case, okay? She had caught her daughter doing that. Confronted her daughter with that.

48

said, you can't lie in court, Madison, okay? Okay? That's not something that you can do. You can't lie in court. And so she got on the text message and contacted Gauge and said, you know what? I've changed my mind. Make sure you tell the truth in Court. Okay? That's what precipitated that. But for the investigation by Stefani, we wouldn't know anything about that, because nobody else for goodness sakes was investigating this situation or these lies that they were made aware of. Okay.

Now, I want to talk about something else. And I am going to warn you ahead of time I am probably going to cover this twice because I was driving home Tuesday night — I live in Brighton. And driving home Tuesday night, as you can imagine, I am spending a lot of time thinking about this case, you know. I am thinking about — Judge Collette gave us until today to do our closing arguments, and I am thinking to myself, what am I going to say on behalf of Brian, you know? And I don't know when it came to me, but all of a sudden it came to me, all right? And I thought, you know what? You know what? Even the Assistant Prosecutor doesn't believe Madison. Even the assistant prosecutor doesn't believe her. And he kind of helped me out a little bit in his closing argument with respect to that, also.

And when I get ready for a case I read everything. My family goes nuts because I take over the kitchen table and

49

I read it all. I mean, even the most mundane things. And I am getting ready for this trial. I read on the page of the complaint that the Judge has already read you — there is a part where it talks about when it's alleged to have happened. And it says on/or about. Okay? And I read that on this. And it says from 1-1 of '13 to 12-31 of '13. A year-long window. And I thought, I have been doing this a long time, but I have never read an Information that charges a full year. I thought, I wonder what's that all about? I put it in the back of my head and I kept it.

And then the Detective is up there on the witness stand, and I am asking her questions, okay, on cross examination. And I said to her — and lawyers hate to ask questions they don't know the answers to by the way, and I didn't know the answer to this because they won't give me copies of their warrant requests, okay, but I asked her — I said, did you ask the Prosecutor for an on/or about for a year? Did you ask for a year's window in this charge? And she looked at me like I was nuts. And she said, no. I didn't.

And let's think about collectively all of us and let's remember what she said. What she said was — I think I recall that correctly. She said something about February of '13, to June of '13, was the window that she asked forensic when these alleged offenses occurred. Okay. She put that on

50

1 her warrant request. Well, guess what the Ingham County
2 Prosecutor's Office did? They charged a year. Why? They
3 read the report. They read the evidence, and guess what? It
4 wasn't reliable enough. They didn't believe it enough that
5 they were willing to charge what the Detective asked them to
6 charge. If -- because the Detective did the interviews. The
7 Detective talked with Madison. The Detective got the timeline
8 from Madison, and when the Ingham County Prosecutor's Office
9 reviewed it, they didn't believe it, folks, because if they
10 had believed it, they would have charged what the Detective
11 asked for. They didn't believe it.
12 　　　　So how can you come into this courtroom -- how can
13 you possibly come into this courtroom and say, we didn't
14 believe the investigation enough that we were comfortable with
15 the timeline that the single source gave us as to when this
16 happened so we have to open this all up this far? Here I am
17 waving my hands again. I apologize, but you know -- all this
18 far. So that whatever happens to come in in trial, because
19 all of these stories keep changing, we get a window big enough
20 to do it?
21 　　　　Now, think about that. Think about that when you go
22 back into the jury room. If the Ingham County Prosecutor's
23 Office isn't comfortable enough with the investigation or the
24 information from the single source that comes through their
25 Detective to them as to what the timeline is, why should you

51

1 folks believe it? Why should you folks go back into that jury
2 room and conclude that in some way they have proven their case
3 beyond a reasonable doubt that my client did anything wrong?
4 If they don't believe it, you shouldn't either.
5 　　　　Now, I am going to kind of go through maybe a
6 laundry list kind of a list of things that I think that you
7 ought to consider when you go back into the jury room. The
8 Assistant Prosecutor had a theme in his opening statement
9 about vulnerability and things like that. There is three of
10 them. It's a common thing in English, a trilogy, hit three
11 different things, but one of those things was vulnerability.
12 And he followed up in his closing argument with the
13 vulnerability part of it, but here is what I want you to think
14 about, and I hope I did a good enough job on Brian's behalf
15 this way. But you know, the -- the inference or the argument
16 or maybe the unstated argument in all of this was is that
17 Brian waited for windows of opportunity to do this. Okay.
18 But I tried to make a point out of the fact that Brian was a
19 stay-at-home dad for a while. Brian had weird scheduling
20 hours. Brian had all of those things. Brian had plenty of
21 opportunities to be alone with Madison, and as a matter of
22 fact, was alone with Madison.
23 　　　　So what's inconsistent with that argument about
24 vulnerability and things happening in secret? I don't want to
25 do a quote because I tried to write down what the Assistant

52

1 Prosecutor had said in his opening statement to you, but he
2 said something about these situations are things that happen
3 in secret. They are secretive type of things. We know from
4 the testimony about the alleged incident in the basement -- I
5 mean, the family was literally at the top of the stairs in the
6 kitchen. The other incidents that she talks about people are
7 home. The house is full. Okay. That's not consistent with
8 what their theory of the case is, and that is, is that these
9 are things that happen in secret.
10 　　　　Now, if the testimony had -- had -- had come out
11 that -- that he didn't -- he being Brian -- didn't have an
12 opportunity to be alone or be in secret or just the two of
13 them there, then my argument makes no sense. But what I'm
14 trying to point out to you is that the evidence that I think I
15 brought out in this case is that Brian had plenty of times to
16 just be alone with his daughter -- his stepdaughter, excuse
17 me, and nobody is saying at all that anything happened at
18 those times. Nothing at all.
19 　　　　So I think that the whole theory of things happening
20 in secret, and that lends credibility to the stories that you
21 are being told, that's out the window. Okay?
22 　　　　You know, in -- in the Assistant Prosecutor's
23 closing argument he said to you -- and I wrote down in my
24 notes kind of reverse logic. I wrote down reverse logic here,
25 because we are trying to paint Stefani as some type of bad

53

1 person to you now. Okay. You recall in -- in the Assistant
2 Prosecutor's opening remarks he told you that one of the
3 people he was going to call was Stefani, but he didn't, but I
4 did. So you got to hear from her. But he is now trying to
5 paint her as a bad person, and he is trying to address with
6 you the delay of a year and-a-half or two years by saying that
7 that somehow -- you know, why -- why would you disclose to --
8 to mom when she treats you that way, when she acts that way
9 towards when you she's not supportive? But that's reverse
10 logic, folks, and here is why it's reverse logic. Because
11 what the Assistant Prosecutor is talking about occurred later
12 on, long after all the disclosures had occurred, okay, after
13 they claim that she said all of those things. That's when --
14 and when these folks weren't doing their job, that's when mom
15 started to question what's going on here. And that's just
16 natural instinct. You are right. Nobody wants to believe
17 this would happen, and all of a sudden you start hearing
18 things and you are thinking, that doesn't make any sense.
19 That's not the way I remember it, and you start looking into
20 it because nobody else will. The officials won't, okay? So
21 to stand before you and say that -- that you ought to just
22 kind of push aside or ignore or somehow discard this waiting a
23 year and-a-half or two years to disclose because mom is not
24 going to be receptive to this because of the way mom acted
25 after she allegedly disclosed, just doesn't make any sense.

54

Joint Exhibit 022

55

1   Okay.
2        What we do know from all the testimony in this case
3   is up until that time this is a loving, caring, hugging good
4   night family basically arguing over who gets to go to kid's
5   sporting events type of thing. So there is no evidence at all
6   to show that -- that mom would not have been supportive,
7   wasn't supportive, and that mom wasn't there to meet all of
8   her daughter's needs, because she was, and that's what the
9   evidence is in this case.
10       Got written down here a lot of things I've already
11  gone over with you about admitting lying, changing stories
12  about school, talking about things that can't be confirmed.
13  Okay.
14       What I want you to -- what I want to leave you with
15  and kind of the way I want to leave you is back to my talk
16  about the civil war and my blue pen and about how the stories
17  changing and about how the truth and the facts don't change.
18  Just doesn't happen. Okay. And what we do know is we do
19  know, you know, through all the testimony and the evidence in
20  this case, what we do know, unfortunately, is that the single
21  source that the Prosecution is relying on in this case -- this
22  single source that the Prosecution is relying on in this case
23  is an admitted liar, a person who has changed their stories
24  repeatedly, changed their stories for the first time here in
25  the courtroom.

56

1        These are not the things, ladies and gentlemen, that
2   rise to the level of beyond a reasonable doubt. That's just
3   not beyond a reasonable doubt. You don't have to come back
4   and say, you know, anything other than not guilty. And the
5   not guilty can be just simply they didn't prove their case.
6   They don't have the evidence. They don't have the witnesses.
7   They don't have the elements beyond a reasonable doubt.
8        And when you go back there on behalf of Brian -- I
9   am completely confident that when you go back there, and if
10  you think about what it is I've talked to you about, okay, the
11  lack of investigation, the poor investigation, the fact that
12  the Ingham County Prosecutor's office didn't even believe her
13  when they issued the charges, all of the inconsistencies and
14  changes in stories that you've heard in this case, you are
15  going to be left with only one potential verdict in this case,
16  and that potential verdict that you have is that Brian
17  Alexander is simply not guilty.
18       And I want you to think about Bill's dumb example
19  about the civil war and Bill's dumb example about the blue
20  pen, okay, and my comment about, in my world a lie is a lie is
21  a lie, and you don't convict people on lies. And the facts
22  don't change, and the law -- excuse me, the facts don't
23  change, okay? The facts don't change. The truth doesn't
24  change.
25       Judge Collette is going to tell you -- he is going

57

1   to say, you know what? You can use your common sense and you
2   can use your everyday experiences. And what I want you to
3   think about is -- because we have all experienced this in our
4   lives before. When people are lying about something or they
5   are not telling the truth about something or they are trying
6   to hide something, they can't keep the stories straight. It
7   always changes. Little nuances. It doesn't have to be big
8   stuff. You just catch little nuances. You catch small
9   things, but when people are telling stories they don't write
10  down notes. They don't keep track of what they are telling
11  one person, to person, to person, to another person. They
12  can't keep track of it, and that's the only reason that
13  stories change is people can't keep track of what they've told
14  anybody else. And it isn't that type of evidence -- it's not
15  that type of evidence on which we find people guilty beyond a
16  reasonable doubt.
17       So I am going to ask you on behalf of Brian, first
18  of all, when the Assistant Prosecutor gives you his second
19  closing argument, go back there and think to yourself, what
20  would McCririe have said in response to what the Assistant
21  Prosecutor told you? And just like I promised you in my
22  opening statement, I am going to ask you to come back with a
23  verdict that's consistent with the law. It's consistent with
24  the facts. It's consistent with common sense. And that is,
25  Brian Alexander is not guilty of all of these charges.

58

1        Thank you very much for your time, ladies and
2   gentlemen.
3        MR. KWASNIK: Excuse my rudimentary statement here.
4   Why? That is one thing that this Defendant, this Defense
5   attorney has not been able to show you. Why? I want you to
6   keep that in mind as we go through this process.
7        Defense counsel is a brilliant attorney, and he did
8   something that was brilliant in his closing argument when he
9   talked about even the Assistant Prosecutor does not believe.
10  It would be absolutely improper for me to address that
11  personally. That is reversible error if I were to even talk
12  about my own personal beliefs. So he can throw that out there
13  knowing that I can't respond. That's sneaky, but that's
14  brilliant.
15       Thank goodness that we have in this courtroom common
16  sense. Thank goodness that we have all been teenagers at some
17  point and we understand a lie is not a lie is not a lie.
18  There are differences in lies. That's common sense. We
19  understand that because it's true. Because you don't come
20  home straight from work and you stop at the high school first
21  does not mean that you are going to accuse your stepfather of
22  abusing you on multiple incidents. For what purpose? Why?
23  She gets nothing out of this.
24       So I am not afraid -- you can go back in the jury
25  room and you can ask yourselves WWBD, what would Bill do with

Joint Exhibit 023

1  this information, because you can ask yourself that all day
2  long, but he can't answer this question and nobody can,
3  because there is no reason.
4      We talked about beyond a reasonable doubt.  What's
5  beyond a reasonable doubt?  Judge Collette will read you a set
6  of instructions that specifically addresses reasonable doubt.
7  And basically he is going to talk about it's a fair and honest
8  doubt arising out of the evidence or lack of evidence.  But
9  that's kind of a confusing definition because you use doubt to
10  define doubt.
11      Folks, there is a reason that we don't pack these
12  juries with lawyers and judges, because we want people with
13  everyday common senses and experiences.  You use your own
14  common sense and everyday experience to try to figure this
15  out.
16      The People have put forth a case that makes common
17  sense.  It makes sense that because there is no reason for
18  Madison Bostwick to come forward and do this.  She gets
19  nothing out of this other than it happened.  That makes common
20  sense.
21      And the Defense, though, they didn't have to do
22  anything.  They did put on a defense.  They presented an
23  alternate theory, and so you can look at that alternate
24  theory.  That alternate theory is Madison Bostwick is doing
25  this because she wanted to live with her dad or because she

59

1  point.
2      She has lost her relationship with her mother.  She
3  has moved in with her father in May and -- according to the
4  timeline and when he moved up here.  That means that she
5  doesn't live with her younger siblings anymore.  She doesn't
6  have the room she had.  She doesn't have this television,
7  right, that was attached to the wall.
8      Knowing that her personal and private behavior that
9  took place two years after the Defendant assaulted her would
10  become subject to the Defense in court, she knows that going
11  in.
12      You know, it -- it -- it would have been so easy at
13  any point for her to say, you know what?  This is just a
14  misunderstanding.  Brian -- Brian and I -- he is a good guy
15  and we wrestle around a lot, and he may have not understood
16  what he was doing and made me uncomfortable, but I don't think
17  he really meant to do anything, and all this would go away.
18  She could have gotten off that train at any time.  But to her
19  credit she has not changed her story because the things that
20  he did were not a misinterpretation.  You don't put a 14 year
21  old girl on your lap as you lay there and grind your genitalia
22  into her and have it be a wrestling move.  That's not the way
23  that works.  And you don't do it repeatedly, and she knows it
24  and he knows it and she wasn't willing to go back off of that.
25      You have here something that is called collective

61

1  wanted to, I guess, get out from under the thumb of the
2  Defendant.  But we know that that doesn't make common sense.
3      Take that back to the jury.  Ask yourself what would
4  Bill do?  And you look at that and you explore it fully, but
5  in the end, you look at it through your lens of common sense,
6  and when you take that theory that they put forward and you
7  look at it through your lens of common sense, it does not
8  stand up.  It does not stand up to the timeline which the
9  Defense conveniently just disregarded out of hand.  Why did
10  they do that?  Because the timeline tells the story.  Because
11  when Madison first disclosed in December of 2014, all of the
12  things that they want to say is the reason for this disclosure
13  hadn't happened yet.
14      What is Maddie's motivation to lie?  For the fun of
15  telling her sister, telling Gauge, telling her mom,
16  confronting the Defendant, going through a forensic interview,
17  talking to a Prosecutor, going and testifying and subject to
18  cross examination at a preliminary exam, having her mom
19  secretly record her and turn that over to Defense to come up
20  here and testify for three hours about personal things that
21  have nothing to do with this case the week before she's to
22  start her senior year in high school?  That's her motivation
23  to tell you folks?  As nice as you all seem, you are strangers
24  to her and you don't need to know any of her personal
25  business.  Neither do I.  But unfortunately, we all do at this

60

1  memory.  When you go back into the jury room, and after you
2  get the instructions from the Judge, and you get the okay to
3  start deliberating, you can start with your collective memory.
4  And the Defendant -- Defense attorney just got up here and he
5  attacked this idea that -- that I misinterpreted or I was
6  twisting the way that exhibit, the Defense A, came in about
7  Gauge.  And that he asked -- he asked them what it meant?  And
8  they told her -- told him that it was a lie.  You take your
9  collective memory.  What was that exchange really like?  It
10  was much more like a, isn't it true that blah, blah, blah, and
11  that was a lie.  And he got this 17 year old girl to say yes.
12  But what really is the truth?  I am not saying that it was --
13  that she was telling the whole truth or planning to tell the
14  whole truth.  These are complicated issues.  He wants to say a
15  lie is a lie is a lie is a lie.  That all lies are the same.
16  Can't be guilty.  All lies are the same, or that we want to be
17  simple with this.  Boy, if she was -- was -- wanted to not
18  disclose this other part, and she had planned for that to
19  happen, then nothing she says can be relied on.  But that's
20  not what the law is, and that's not what the jury instruction
21  for the credibility will instruct you.
22      Excuse me.  I read a little bit of the credibility
23  instruction in my opening statement.  Talked about the fact
24  that the Judge will read that to you.  Excuse me.  That
25  credibility instruction goes through this whole idea, and I

62

Joint Exhibit 024

**Page 63**

1 want you to listen to it very closely. It talks about the
2 fact that you can believe some, all or none of what a witness
3 tells you. Ask them, do they have -- could they see or hear
4 clearly? It goes through a whole list, but it really gets
5 down to the bottom, the last couple. Do they have a
6 motivation to lie? Do -- what they say, does it make common
7 sense? Does it meet your standard of common sense? Does
8 Madison have a motivation to lie? Why would she lie? That
9 question is not -- cannot be answered in this case.
10      Madison Bostwick has not changed her story. When
11 you think back about an event that happened to you, there are
12 events, a major event, a traumatic event. When you have that
13 kind of trauma, you are concentrated on what is happening
14 right in front of you, and there could be other aspects that
15 have that fall aside. When you are with your child in the
16 store and you turn and suddenly that child is not there, you
17 are not concerned about those other ancillary facts. You are
18 concerned about what's going on with that child. And the
19 trauma is the same for Madison Bostwick. So when she knows
20 she was in her mother's bed in that room, she knows this is
21 what happened to her. Whether she was there home sick or home
22 from school or home after school from sick -- as sick, is that
23 really -- is that what this case depends on, or should it
24 depend on more that she came in; she has been consistent over
25 and over and over again?

**Page 64**

1      Escalating behavior. When the Defense said this I
2 loved this, because I want you to use your collective memory.
3 Because escalating behavior, bad behavior of Madison Bostwick
4 was mentioned several times in this case. Do you know by who?
5 By the Defense attorney in his questions. And you know
6 what -- an answer of what he wanted either from Stefani
7 Alexander or Brian Alexander. He sat -- he stood right here
8 over -- at least four times and said, isn't it true that her
9 behavior was -- that, you know, prior to this disclosure her
10 behavior was -- was escalating, and she was doing these
11 things? And they all said, no. No. There was no escalation
12 of behavior. Everything was pretty normal. Had there been a
13 couple of instances? Sure. But there was no escalation.
14 That's his word. You have heard it, but you didn't hear
15 them -- what we say in our questions is not facts in evidence.
16 It's the answers.
17      THE COURT: You need to wrap up, sir.
18      MR. KWASNIK: I am, Your Honor. Thank you.
19      When you look at their reasoning, their reasoning
20 that a 16 year old high school junior planned to move in with
21 her dad to escape a repressive household rules and discipline,
22 and the plan she chose to execute was this, that she would
23 tell her younger sister that her younger sister -- that they
24 would say, we are not going to talk about it anymore. That
25 then that younger sister would then on her own not even go and

**Page 65**

1 tell anyone, but just be upset about it, be asked by a
2 teacher, disclose to that teacher, and have child protective
3 services call an investigation that would be the -- that's
4 what they are saying. That's their defense that that's what
5 she did in this case in order to make this happen. So in
6 addition to why -- how -- how is this even possible? She
7 can't plan -- possibly plan that out. She is a 17 year old
8 girl. She is not a master criminal. So use your lens of
9 common sense and explore that fully, and when you are done
10 exploring it, come back with the only thing that does make
11 sense, and that is what we put forward as the People of the
12 State of Michigan.
13      Maddie Bostwick was alone when this happened. She
14 was alone when she told her mother. She was alone when she
15 sat here in a room full of strangers. But she had one thing
16 on her side, and that's the truth, and it's that truth that
17 demands justice, and I ask that you all use that truth as the
18 law allows and believe Maddie Bostwick and return a verdict of
19 guilty on all four counts. Thank you very much.
20      THE COURT: All right. We are going to take a short
21 break for you to go on and order your lunch. If anybody
22 doesn't want pizza then they can get something. The pizzas
23 are great. So go on back and Kacie will come in, and you can
24 look at the menu if you want or have pizza like me. All
25 right. Don't talk about the case. All right.

**Page 66**

1      (Off the record at 11:12 a.m.)
2      (On the record at 11:31 a.m.)
3      THE COURT: Well, did you all agree on what you
4 wanted?
5      JUROR #3: Kind of.
6      THE COURT: Have a seat everybody. Thank you.
7 Okay. Let's see. Everybody ready?
8      Members of the jury, the evidence and arguments in
9 the case are finished. I'd like to instruct you on the law.
10 I will explain the law that applies here. Remember that you
11 have taken an oath to return a true and just verdict. It must
12 be based on the evidence and my instructions. You must not
13 let sympathy or prejudice influence your decision.
14      Now, as our jury you decide the facts of the case.
15 You have that job. It's nobody else's. Please remember that
16 you must think about all the evidence and then decide what
17 each piece of evidence means and how important you think it
18 actually is. And this will include whether you believe these
19 witnesses, and what you decide about the facts, is, of course,
20 a final decision.
21      Now, I have to instruct you about the law. Please
22 take the law as the Court gives it to you. If an attorney
23 said something different about the law, please follow what I
24 say. At various times I have already given you some
25 instructions on the law. Take all of my instructions together

**Joint Exhibit 025**

1 as the law you are to follow. You should not pay attention to
2 some and ignore other instructions. So to sum up, you have
3 the job to decide our facts, apply the law as I give it to
4 you, and in that way decide this matter.
5          Now, anyone accused of crime is presumed to be
6 innocent, and that means that you must start with the
7 presumption that this Defendant is innocent. This presumption
8 continued throughout the trial and entitles him to a verdict
9 of not guilty unless you are satisfied beyond a reasonable
10 doubt that he is actually guilty.
11          Every crime is made up of parts we call the
12 elements. The Prosecutor must prove each element of the crime
13 beyond a reasonable doubt. Now, the Defendant is not required
14 to prove his innocence or do anything. If you find that the
15 Prosecution has not proven every element beyond a reasonable
16 doubt, then you must find the Defendant not guilty.
17          A reasonable doubt is a fair, honest doubt. It will
18 be growing out of the evidence or lack of evidence. It's not
19 merely an imaginary or possible doubt, but a doubt based on
20 reason and your own good common sense. A reasonable doubt is
21 just that, a doubt that's reasonable after a careful and
22 considered examination of the facts and circumstances in this
23 case.
24          Now, when you discuss the case and decide on a
25 verdict, you can only consider the evidence that was properly

67

1 admitted. So it is important for you to understand what is
2 evidence and what is not evidence. Now, in this case the
3 evidence includes the sworn testimony of witnesses and those
4 few exhibits that were admitted and anything else I may have
5 told you to consider.
6          There is a lot of stuff that's not evidence and you
7 must be careful not to consider those things as such, and I'd
8 like to tell you some of those things. The fact that the
9 Defendant is charged with crime and is on trial is not
10 evidence. Likewise, the fact that he is charged with more
11 than one crime is not evidence. The statements of the
12 attorneys and the arguments they make are not evidence. They
13 are only meant to help you understand the evidence and each
14 side's legal theories. The lawyers's questions to witnesses
15 are also not evidence. You should consider the questions only
16 as they give meaning to the witness's answers. You should
17 only accept things the attorneys say that are supported by
18 evidence or by your own common sense and general knowledge.
19          Now, the things that I've said, the rulings I've
20 made, questions and my instructions are also not evidence. I
21 have a duty to see that we have a trial conducted under the
22 law and tell you the law that applies here, but when I make a
23 comment or give you an instruction, I am not trying to
24 influence your vote or express my opinion about the case. If
25 you believe, of course, that I have some opinion about how you

68

1 should decide the case, pay no attention to that. You are the
2 judges of our facts. You must decide the case from the
3 evidence that you heard.
4          Now, there were a few times I excluded some evidence
5 that was offered. I even struck some -- a few little items of
6 testimony. Those are things that are not to be considered in
7 deciding the case. Make your decision only on the evidence
8 properly let in and nothing else.
9          Your decision should be based on all the evidence
10 regardless of who produced it. You should use your own common
11 sense and general knowledge in weighing and judging evidence,
12 but you should not use any personal knowledge you may have
13 about a place, person or event. So once again, decide the
14 case based on all the properly admitted evidence.
15          Now, facts can often be proved by direct evidence
16 from a witness or from an exhibit. Direct evidence is about
17 what we actually see or hear. And to give you a simple
18 example, if you look outside this afternoon and it's raining,
19 that's direct evidence it's raining because you actually
20 saw it falling yourself.
21          Facts can also be proved by indirect or
22 circumstantial evidence. That kind of evidence is evidence
23 that normally or reasonably leads to other facts. To give you
24 an example, if you see someone come in from outside, they are
25 wearing a rain coat, it's got little drops of water on it,

69

1 that would be circumstantial evidence that it's raining. Now,
2 you can consider that kind of evidence. Circumstantial
3 evidence by itself or a combination of circumstantial and
4 direct evidence can be used to prove the elements of a crime.
5 So in other words, you should consider all the evidence that
6 you believe.
7          Evidence has been offered that one or more witnesses
8 in this case previously made statements inconsistent with
9 their testimony during the trial. You may consider such
10 earlier statements in deciding whether the testimony at this
11 trial was truthful in determining the facts of our case.
12          Now, when the lawyers agree on a statement of facts
13 those are called stipulated facts. You may regard such
14 stipulated facts as true but you don't have to do that.
15          Now, you could also consider why this -- or whether
16 this Defendant had a reason to commit these crimes, but a
17 reason by itself is not enough to find anyone guilty.
18          The Prosecutor does not have to prove this Defendant
19 had a reason to commit the alleged crimes. He only has to
20 show that the Defendant actually committed the crimes and that
21 the Defendant meant to do so.
22          A person's intent may be proved by what they say,
23 what they do, how they did it or by any other facts and
24 circumstances present in our evidence.
25          I have told you before you have to decide the facts.

70

Joint Exhibit 026

1   You must decide which witnesses you believe and how important
2   you think their testimony is. You don't have to accept or
3   reject everything a person said. You can believe all, none or
4   part of anybody's testimony. In deciding which testimony you
5   believe, you should rely on your own common sense and everyday
6   experience, but in deciding whether you believe a witness's
7   testimony, set aside any bias or prejudice you may have based
8   on their race, gender or national origin or any other reason.
9       We don't have a set of rules for judging whether we
10  believe witnesses, but the following questions, which I think
11  I read earlier, are helpful. Was the witness able to see or
12  hear clearly? How long were things going on or how long were
13  they watching or listening? Were other things going on that
14  may have distracted them? What kind of memory do they present
15  in front of you? How did the witness look and act when
16  testifying? Did they seem to make an honest effort to tell
17  the truth or do they seem to evade questions or argue with the
18  attorneys? How about the person's age and maturity, does that
19  affect their testimony? Does the witness have a bias,
20  prejudice or personal interest in how the matter is decided?
21  And have there been promises, threats, suggestions or other
22  influences that affect how the witness testified? In general,
23  does the witness have a special reason to tell the truth or a
24  special reason to lie? All in all, how reasonable does the
25  witness's testimony seem when you think about all the other

71

1   evidence you've heard?
2       Now, there are times that differing witnesses will
3   not agree in their testimony and you must decide which
4   testimony to accept. Please think about whether the
5   disagreement involved something important or not and whether
6   you think someone is lying or is simply mistaken. And people
7   will often see and hear things differently and they may
8   testify honestly but simply be wrong about what they thought
9   they saw or remembered.
10      It's also a good idea to think about which testimony
11  agrees best with the other evidence in the case. However, you
12  may conclude that a witness deliberately lied about something
13  that's important to how you decide the case. In that
14  situation you may choose not to accept anything the witness
15  said. On the other hand, if you think the witness lied about
16  some things and told the truth about others, you can accept
17  the part you think is true and of course, ignore the rest of
18  the testimony.
19      Don't decide the case based on who had the most
20  witnesses. Think about what the witness said and whether you
21  believe them. Then you must decide that the testimony and
22  evidence you believe proves beyond a reasonable doubt that the
23  Defendant is guilty.
24      The lawyers or their representatives talked to
25  several witnesses, and there is absolutely nothing wrong with

72

1   that. The lawyers have to talk to witnesses to find out what
2   they know about a case and what their testimony is likely to
3   be.
4      You heard testimony from a witness who is a police
5   officer. That testimony is to be judged by the same standards
6   you use to evaluate the testimony of everyone else.
7      Now, in Count 1 -- and all of these read almost the
8   same, but I still have to read them all. Defendant is charged
9   with the crime in Count 1 of second degree criminal sexual
10  conduct. To prove the charge the Prosecutor must prove each
11  of the following elements.
12      First, that the Defendant intentionally touched
13  Madison Bostwick's genital area or the clothing covering that
14  area.
15      Second, that this was done for sexual purposes or
16  could reasonably be construed as being been done for sexual
17  purposes.
18      Second, that Madison Bostwick was 13, 14 or 15 years
19  old at the time of the alleged act.
20      And lastly, that at the time of the alleged act the
21  Defendant and Madison Bostwick were living in the same
22  household.
23      Count 2, the Defendant is charged with the crime of
24  second degree criminal sexual conduct. To prove this charge
25  the Prosecutor must prove each of the following elements

73

1   beyond a reasonable doubt.
2      First, that the Defendant intentionally touched
3   Madison Bostwick's genital area or the clothing covering that
4   area.
5      Second, that this was done for sexual purposes or
6   could reasonably be construed as having been done for sexual
7   purposes.
8      Nextly, that Madison Bostwick was 13, 14 or 15 years
9   old at the time of the alleged act.
10      And lastly, that at the time of the alleged act the
11  Defendant and Madison Bostwick were living in the same
12  household.
13      Count 3, the Defendant is charged with the crime of
14  criminal sexual conduct. To prove -- second degree criminal
15  sexual conduct. To prove this charge the Prosecutor must
16  prove each of the following elements.
17      First, that the Defendant intentionally touched
18  Madison Bostwick's genital area or the clothing covering that
19  area.
20      Second, that this was done for sexual purposes or
21  could reasonably be construed as having been done for sexual
22  purposes.
23      Nextly, that Madison Bostwick was 13, 14 or 15 years
24  of age at the time of the alleged act.
25      And third, that at the time of the alleged act the

74

Joint Exhibit 027

1 Defendant and Madison Bostwick were living in the same
2 household.
3     Count 4, the Defendant is charged with the crime of
4 second degree criminal sexual conduct, and once again, to
5 prove the charge the Prosecutor must prove each of the
6 following elements beyond a reasonable doubt.
7     First, that the Defendant intentionally touched
8 Madison Bostwick's buttocks or the clothing covering that
9 area.
10     Second, that this was done for sexual purposes or
11 could reasonably be construed as having been done for sexual
12 purposes.
13     Nextly, that Ms. Bostwick was 13, 14 or 15 at the
14 time of the alleged act.
15     And lastly, that at the time of the alleged act the
16 Defendant and Madison Bostwick were living in the same
17 household.
18     To prove the charges it's not necessary that there
19 be evidence other than the testimony of Madison Bostwick if
20 that testimony proves guilt beyond a reasonable doubt.
21     To prove the charge the Prosecutor does not have to
22 show that Ms. Bostwick resisted the Defendant.
23     The Prosecutor must also prove beyond a reasonable
24 doubt that these crimes occurred within Ingham County. Time,
25 however, is not an element of the crime of criminal sexual

75

1 should give up your own honest opinion about this case just
2 because other people disagree with you or for the sake of
3 reaching some verdict. In the end your vote must be your own
4 and you have to vote honestly and in good conscience.
5     The possible penalty in every criminal case should
6 not influence any decision. It's my duty to fix the penalty
7 within the limits provided by law.
8     If you want to communicate with me while you are in
9 that jury room have the foreperson write a note and give it to
10 the court officer. Please don't talk directly with any of us,
11 lawyers, court officers, Judge or anyone else involved while
12 you are deliberating.
13     So obviously, you write a note. She brings it to
14 me. I review it, write back on it or do something with it,
15 all right? So don't talk to her directly. So don't let
16 anyone, even me, know how your voting stands. So until you
17 come back with a unanimous verdict don't reveal this to
18 anybody outside the jury room.
19     Now, we have exhibits here for you.
20     And are they all organized here?
21     We got them all. We'll send those on in for you to
22 review.
23     I have tape-recorded my instructions hopefully. And
24 I also have this copy I'm going to loan you to use if you wish
25 in the jury room.

77

1 conduct. The Prosecutor does not have to prove the date or
2 time of the offense beyond a reasonable doubt.
3     Now, ladies and gentlemen, when you go in the jury
4 room, you have to pick a foreperson. That's my suggestion
5 anyway. And the foreperson should see that all discussions
6 are carried on in a business like fashion and that everybody
7 has a fair chance to be heard. During deliberations, please
8 don't use your cell phone while you are in the room and don't
9 use any other — I don't know what other communication
10 equipment you might have with you, but if you did, don't use
11 that either. And on breaks, obviously, you can make calls as
12 long as it's not related to the case.
13     A verdict in a criminal case has to be unanimous.
14 So in order to return a verdict it's necessary that each
15 person agrees on the verdict. In the jury room you discuss
16 the case among yourselves, but ultimately, each person has to
17 make up their own mind. Every verdict must represent the
18 individual considered judgment of each juror.
19     You have a duty as our jury to talk to each other
20 and make every reasonable effort to reach agreement. Express
21 your opinions and the reason for those, but keep an open mind
22 as you listen to your fellow jurors. Rethink your opinions
23 and don't hesitate to change your mind if you decide you were
24 wrong. Try your best to work out differences. However,
25 although you should try to reach an agreement, none of you

76

1     Now, please remember, you should think about all of
2 my instructions together as the law you are to follow.
3     Now, this Defendant is charged with four separate
4 Counts, that is, with the crimes of — four crimes of criminal
5 sexual conduct in the second degree. They are all separate
6 crimes. This Prosecution charges that the Defendant committed
7 all of them. You must consider these crimes separately in
8 light of all the evidence in our case. You can find the
9 Defendant guilty of all of these. You can find him guilty of
10 any one or any combination of these, or of course, you can
11 find him not guilty. And we have a verdict form for you to
12 use.
13     See if I can figure out how to turn this off. I
14 cannot read stop I guess. Anyway, I'll rewind that and send
15 it in to you. Just ignore those last few minutes.
16     Ladies and gentlemen, this is your verdict form. It
17 has four Counts. There is a place for the foreperson to sign
18 and date, and when you have reached a decision on all four of
19 these in some fashion, please have the foreperson sign
20 date it and bring it back into court with you. Don't talk
21 about it until I ask for it.
22     Any objections to the instructions?
23     MR. MCCRIRIE: None, Judge.
24     MR. KWASNIK: None, Your Honor.
25     THE COURT: All right. So we have the instructions.

78

**Joint Exhibit 028**

Kay, would you be good enough to draw somebody off?

1  THE CLERK: Okay. Juror in seat No. 8.
2  THE COURT: Yes. The only person that smiled at me.
3  Ma'am, thank you for your time. This does count as jury
4  service. And I think there is a rule, at least there used to
5  be, where if you've had a jury service on a trial from the
6  last year, if you were called again you can be excused if you
7  want to, or you can serve. Thank you for coming.
8  JUROR #8: Thank you.
9  THE COURT: All right. The other members of our
10  jury, you are our jury. And let's swear in Kacie. Please
11  have a seat. We are not quite done everybody. Thank you.
12  (Law clerk sworn in at 11:50 a.m.)
13  THE COURT: So I think at this time if you wish you
14  can use the restrooms, and then when you are all in the
15  room – we'll have the information in there for you, and when
16  everybody is in there, of course, then you start deliberating.
17  All righty? Okay. Go ahead.
18  Any objection to the instructions other than our
19  previous discussions?
20  MR. MCCRIRIE: None, Judge.
21  MR. KWASNIK: No, Your Honor.
22  THE COURT: Thank you. Go ahead.
23  (Jury gone at 11:50 a.m.)
24  THE COURT: All right. We will be in recess.

79

1  (Off the record at 11:51 a.m.)
2  (On the record at 2:06 p.m.)
3  THE COURT: Jurors just want a break. Is it all
4  right if we go with you two here?
5  MR. KWASNIK: Sure.
6  MR. GRABEL: Of course.
7  THE COURT: Because they are out there roaming
8  around. Anyway, boy, it's getting cold in here. It's just a
9  note. Jurors want a break, which is normal. Let's have them
10  come back in and I'll tell them to take a break and then they
11  can go back out.
12  MR. MCCRIRIE: Okay.
13  (Jury back at 2:07 p.m.)
14  THE COURT: Thanks everybody. Have a seat. Do I
15  understand – who is the foreperson? You don't have to stand
16  up. Do I understand that you guys want a break?
17  JUROR #10: Yes, please.
18  THE COURT: Take 15 or 20 minutes. Go on out and
19  mill around wherever you want. Mr. Foreperson, when everybody
20  is back in the room, door closed, you can start again.
21  JUROR #10: Okay.
22  THE COURT: All right. Obviously, don't discuss it
23  while you are on break. Thank you.
24  (Off the record at 2:08 p.m.)
25  (On the record at 3:37 p.m.)

80

1  THE COURT: All right. We have a note that
2  apparently they have reached some verdict. I have no idea
3  what it is. So I think we should have them in, take roll, and
4  find out what it is. All right. Go ahead.
5  (Jury back at 3:38 p.m.)
6  THE COURT: Here is this one note about wanting a
7  break, Kay.
8  THE CLERK: Okay.
9  THE COURT: All right. All righty. Everybody here?
10  Yup. All right. Have a seat. Mr. Foreperson, Kay is going
11  to take roll, and so each person announce you are here as we
12  call your number. And you have reached some verdict, right?
13  JUROR #10: Correct.
14  THE COURT: Okay. Go ahead, then, Kay.
15  THE CLERK: Juror seat No. 1?
16  JUROR #1: Here.
17  THE CLERK: Seat No. 2?
18  JUROR #2: Here.
19  THE CLERK: Seat No. 3?
20  JUROR #3: Here.
21  THE CLERK: Seat No. 4?
22  JUROR #4: Here.
23  THE CLERK: Seat No. 5?
24  JUROR #5: Here.
25  THE CLERK: Seat No. 6?

81

1  JUROR #6: Here.
2  THE CLERK: Seat No. 7?
3  JUROR #7: Here.
4  THE CLERK: Seat No. 9?
5  JUROR #9: Here.
6  THE CLERK: Seat No. 10?
7  JUROR #10: Here.
8  THE CLERK: Seat No. 11?
9  JUROR #11: Here.
10  THE CLERK: Seat No. 12?
11  JUROR #12: Here.
12  THE CLERK: Seat No. 13?
13  JUROR #13: Here.
14  THE COURT: Okay. Mr. Foreperson, would you read
15  whatever is on that form?
16  JUROR #10: Count 1, guilty of criminal sexual
17  conduct second degree. Count 2, guilty of criminal sexual
18  conduct second degree. Count 3, guilty of criminal sexual
19  conduct second degree. Count 4, guilty of criminal sexual
20  conduct second degree.
21  THE COURT: Would you give that to her, please?
22  Juror No. 1, did you hear the verdict as read by your
23  foreperson?
24  JUROR #1: Yes.
25  THE COURT: Was that your verdict so help you God?

82

Joint Exhibit 029

```
1        JUROR #1: Yes.
2        THE COURT: Juror No. 2, did you hear the verdict as
3   read by your foreperson?
4        JUROR #2: I did.
5        THE COURT: Was that your verdict so help you God?
6        JUROR #2: It is.
7        THE COURT: Juror No. 3, did you hear the verdict as
8   read by your foreperson?
9        JUROR #3: Yes. I did.
10       THE COURT: Was that your verdict so help you God?
11       JUROR #3: Yes.
12       THE COURT: Juror No. 4, did you hear the verdict as
13  read by your foreperson?
14       JUROR #4: Yes. I did.
15       THE COURT: Was that your verdict so help you God?
16       JUROR #4: Yes. It was.
17       THE COURT: Juror No. 5, did you hear the verdict as
18  read by your foreperson?
19       JUROR #5: Yes.
20       THE COURT: Was that your verdict so help you God?
21       JUROR #5: Yes.
22       THE COURT: Juror No. 6, did you hear the verdict as
23  read by your foreperson?
24       JUROR #6: Yes.
25       THE COURT: Was that your verdict so help you God?
                            83
```

```
1   read by your foreperson?
2        JUROR #13: Yes.
3        THE COURT: Was that your verdict so help you God?
4        JUROR #13: Yes.
5        THE COURT: Thank you. Anything else by anybody?
6        MR. MCCRIRIE: No, Your Honor.
7        MR. KWASNIK: Nothing from the People, Your Honor.
8        THE COURT: Okay. Well, I'd like to thank you all
9   for your time and service on this particular trial. We
10  appreciate that. And as I told the other lady, I believe
11  there is a rule you don't have to serve within the next year
12  if you get anything from us.
13       You do not have to talk to the lawyers. You are
14  free to leave, but if you want to you are certainly welcome to
15  do that. Any questions for me?
16       JUROR #11: No, sir.
17       THE COURT: Have a good day. Thank you. All rise.
18       (Jury excused at 3:42 p.m.)
19       THE COURT: Kay, we need a sentencing date.
20       THE CLERK: October 7th at 1:15 p.m.
21       THE COURT: Mr. Grabel, is that good for you and
22  counsel?
23       MR. GRABEL: That's fine with me, Your Honor.
24       THE COURT: October 7, 2015 at 1:15.
25       MR. MCCRIRIE: Judge, if I can have just -- I'm
                            85
```

```
1        JUROR #6: Yes.
2        THE COURT: Juror No. 7, did you hear the verdict as
3   read by your foreperson?
4        JUROR #7: Yes, Your Honor.
5        THE COURT: Was that your verdict so help you God?
6        JUROR #7: Yes. It was.
7        THE COURT: Juror No. 9, did you hear the verdict as
8   read by your foreperson?
9        JUROR #9: Yes. I did.
10       THE COURT: Was that your verdict so help you God?
11       JUROR #9: Yes. It was.
12       THE COURT: And Juror 10, as the foreperson, was it
13  also your verdict so help you God?
14       JUROR #10: Yes.
15       THE COURT: Juror 11, did you hear the verdict as
16  read by your foreperson?
17       JUROR #11: Yes.
18       THE COURT: Was that your verdict so help you God?
19       JUROR #11: Yes.
20       THE COURT: Juror 12, did you hear the verdict as
21  read by your foreperson?
22       JUROR #12: Yes.
23       THE COURT: Was that your verdict so help you God?
24       JUROR #12: Yes.
25       THE COURT: Juror 13, did you hear the verdict as
                            84
```

```
1   sorry, what time?
2        THE COURT: 1:15.
3        MR. MCCRIRIE: Judge, I have to be in the Detroit
4   area that afternoon. I apologize.
5        THE COURT: Well, we can go to the 14th.
6        THE CLERK: I think you are gone.
7        THE COURT: Wait a minute. That's when I'm gone.
8   So it will have to be the 21st.
9        MR. MCCRIRIE: I've got nothing that day.
10       THE COURT: 14th I am on vacation. 21st?
11       MR. MCCRIRIE: Perfect, Judge.
12       THE COURT: All right. Anything else?
13       MR. MCCRIRIE: No, Judge. Bond continued?
14       THE COURT: Yeah.
15       MR. MCCRIRIE: Thank you.
16       THE COURT: Okay. We'll see you all back here then.
17  Thank you all for your time today. Kay, here is the file.
18  That's all.
19  (Whereupon, Jury Trial concluded at 3:43 p.m.)
20
21
22
23
24
25
                            86
```

Joint Exhibit 030

```
1    STATE OF MICHIGAN}
                     }SS   .
2    COUNTY OF INGHAM }

3         I, Paul G. Brandell, Certified Shorthand Reporter, do

4    hereby certify that the foregoing Jury Trial was taken before

5    me at the time and place hereinbefore set forth.

6         I further certify that the foregoing is a full,

7    true, and correct transcript of the testimony taken on

8    September 3, 2015.

9

10

11   11-4-15        Paul G. Brandell, CSR-4552
                    Certified Shorthand Reporter,
12                  Registered Professional Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

                        87
```

Joint Exhibit 031